**JUDGE ENGELMAYER**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X

**11 CIV 7153**

GLENCORE LTD.,

U S DISTRICT COURT SDNY

Petitioner,

11 Civ. _____ (   )

-against-

DEGUSSA ENGINEERED CARBONS L.P. A/K/A EVONIK
CARBON BLACK L.L.C., AND HDI-GERLING AMERICA
INSURANCE COMPANY,

Respondents.

------------------------------------------------X

**PETITION TO
COMPEL ARBITRATION**

OCT 11 2011

U.S.D.C. S.D.N.Y.
CASHIERS

The petition of Glencore Ltd. ("Glencore") respectfully shows as follows:

1.    The dispute which is the subject matter of this petition involves an admiralty or maritime claim within the meaning of Rule 9(h) and the case would be within the admiralty or maritime jurisdiction of the United States and of this Honorable Court pursuant to 28 U.S.C. §1333, save for the written agreement to arbitrate hereinafter set forth.

2.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in dispute exceeds $75,000 exclusive of interest and costs.

3.    This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331, 9 U.S.C. § 1, *et seq.*, and 9 U.S.C. §201, *et seq.*

4.    At all times material herein, petitioner Glencore was and is a foreign business corporation with an office and its principal place of business in Switzerland and an office in Stamford, Connecticut.

5.    At all times material herein, upon information and belief, respondent Degussa Engineered Carbons L.P., a/k/a Evonik Carbon Black L.L.C. (collectively, "Evonik"),

was and is a Delaware limited partnership, with an office and principal place of business in Parsippany, New Jersey.

6.      At all times material herein, respondent HDI-Gerling America Insurance Company ("HDI-Gerling"), was and is an Illinois corporation with its office and principal place of business in Chicago, Illinois.

7.      Petitioner Glencore, as seller, and respondent Evonik, as buyer, entered into contracts for the sale of shipments of No. 6 fuel oil to be delivered by barge to Evonik's facilities in Orange, Texas and Ivanhoe, Louisiana, and confirmed their binding agreements by Glencore's written sales contracts dated December 22, 2009 (with an amendment of the same date) and June 28, 2010 (with an amendment dated July 2, 2010), respectively.  (Copies of the subject contracts are attached hereto as Exhibit A).

8.      On or about February 16, 2010, Glencore delivered a shipment of oil to Evonik's plant in Orange, Texas.

9.      In or about March 2010, Glencore delivered a shipment of oil to Evonik's plant in Orange, Texas.

10.      On or about March 9, 2010, Glencore delivered a shipment of oil to Evonik's plant in Ivanhoe, Louisiana.

11.      On or about September 22, 2010, Glencore delivered a shipment of oil to Evonik's plant in Ivanhoe, Louisiana.

12.      Respondent Evonik paid Glencore for the shipments of oil that Glencore supplied pursuant to the subject contracts.

13.   Under Clause 5 of the subject contracts, the parties expressly agreed that the quality of the oil delivered by barge shall be "based on the mutually agreed independent inspector's analysis of the barge composite sample, prior to discharge."

14.   Upon testing the barge composite samples prior to discharge from the barges, the mutually agreed independent inspector, Inland Inspections LLC ("Inland"), certified that, based on its analysis of those samples, the quality of each shipment met the contractual specifications for the oil agreed upon by the parties.

15.   The subject contracts expressly incorporate Glencore's general terms and conditions ("GTCs") dated October 2005 with amendments in July 2008 and July 2009.  (*See* Exhibit A).

16.   Clause 11 of Glencore's GTCs states in relevant part:

LAWS AND ARBITRATION.

This contract shall be governed by and construed in accordance with the laws of the State of New York, USA, and any claim or controversy arising out of, or relating to this contract or breach thereof shall be settled by arbitration, and subject to the rules of the American Arbitration Association, in the City of New York, by a panel of three arbitrators, one chosen by each party and the third nominated by the two arbitrators so chosen.  The decision of the three arbitrators, or two of the three arbitrators shall be final and binding on both parties.  Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.

17.   A "claim or controversy" and dispute has arisen between petitioner Glencore and respondent Evonik.

3

18.     On March 28, 2011, Evonik commenced a lawsuit against Glencore by filing an original petition in the 163rd Judicial District Court of Orange County, Texas, asserting claims relating to the subject contracts.

19.     On the same day, Evonik's alleged insurer HDI-Gerling, alleging it is the subrogee of Evonik, also commenced a lawsuit against Glencore by filing an original petition in the 128th Judicial District Court of Orange County, Texas, asserting the same claims on allegations nearly identical to Evonik's petition.

20.     Both actions allege claims on behalf of Evonik that the subject shipments of oil delivered by Glencore did not meet the contractual specifications for oil on board the barge prior to delivery and caused damage to Evonik's equipment in breach of its contract with Glencore.   Evonik alleges that it has sustained damages as a result of Glencore's breach of contract.

21.     Additionally, both actions Evonik allege that Glencore is liable for breach of warranty, fraud, negligent misrepresentation and products liability for allegedly delivering oil shipments that did not meet the specifications set forth in the governing contracts.

22.     By filing the state court petitions in Texas, respondents have breached Evonik's contractual obligation to arbitrate the subject dispute in New York.

23.     On March 30, 2010 and April 1, 2010, Glencore removed the two actions to the United States District Court for the Eastern District of Texas, Beaumont Division; and respondents moved to remand the actions to the Texas state courts on April 29, 2010.

24.     By orders dated June 13, 2011 and August 1, 2011, the United States District Court remanded the actions to the Texas state courts.

25.     On or about August 18, 2011, Glencore filed answers to the respondents' petitions in the Texas state court actions.

26.     HDI-Gerling, as alleged subrogee, is bound by its subrogor's agreement to arbitration.

27.     By letter dated September 19, 2011 (sent to Evonik by email and fax), petitioner Glencore demanded arbitration of the above disputes with Evonik and HDI-Gerling pursuant to the parties' agreement to arbitrate under Clause 11 of Glencore's GTCs, and appointed Donald P. Murnane, Esq. as its party-appointed arbitrator.  (A copy of the letter dated September 19, 2011 is attached hereto as Exhibit B).

28.     Glencore seeks to recover by arbitration the damages, together with interest, costs and attorneys' fees, it has sustained as a result of Evonik's breach of its agreement to arbitrate any claim or controversy arising out of the governing contracts, and seeks a declaratory award that Glencore has no liability for the Evonik and HDI claims alleged in the Texas state courts.

29.     By letter dated September 29, 2011 from Evonik's counsel and an email dated October 6, 2011 from HDI-Gerling's counsel (copies of which are attached hereto as Exhibit C), respondents have refused Glencore's demand to arbitrate the aforementioned controversy and have refused to appoint an arbitrator under the terms of the arbitration agreement.

30.     By failing and refusing to nominate an arbitrator, respondents continue to breach the governing arbitration agreement with petitioner Glencore.

31.     Additionally, on Friday afternoon, October 7, 2011, Evonik's counsel in Texas faxed to Glencore's counsel in New York a copy of a motion sent to the Clerk of the

Texas district court seeking a court conference and the immediate entry of an order "abating" the pending arbitration proceedings in New York.  (A copy of the motion and covering letter to the Clerk is attached hereto as Exhibit D).  By filing and prosecuting the Texas state court actions and by filing the motion, respondents further have breached Evonik's agreement to arbitrate in New York.

        32.     Petitioner Glencore has duly performed all of its obligations under the arbitration agreement and the governing contracts.

        33.     No previous application has been made to this Court, or any other Court, for the order and relief sought herein.

        WHEREFORE, petitioner requests that this Court, pursuant to 9 U.S.C. §§ 4 and 5 enter an order:

    (a)     directing that respondents appoint an arbitrator for Evonik not later than October 26, 2011 and requiring respondents to proceed with arbitration of the above controversy in the manner provided for in the above agreement;

    (b)     providing that, upon (i) the failure of respondents to appoint an arbitrator for Evonik by October 26, 2011, and (ii) the written request of petitioner Glencore, the Court shall appoint an arbitrator on behalf of the respondent and direct that the arbitration proceed without the respondent;

    (c)     staying all proceedings in the actions brought by respondents against petitioner Glencore in the Texas state courts;

    (d)     awarding petitioner Glencore its costs and attorneys' fees associated with this Petition, and;

    (e)     granting petitioner Glencore such other and further relief as to the Court may seem just and proper.

Dated:  New York, New York
       October 11, 2011

WAESCHE, SHEINBAUM & O'REGAN, P.C.
Attorneys for Petitioner
GLENCORE LTD.

By: _____
John R. Keough, III
111 Broadway, 4th Floor
New York, New York 10006
(212)227-3550

# Exhibit A

From:      Crystal Kora/stamford/glen
To:     brian.saucier@evonik.com
Date:      01/21/2010 03:25 PM
Subject:   Sale - Degussa Engineered Carbons, LP - Contract: 2103063
       (amendment)


Crystal Kora
Glencore Ltd.
Tel: (203) 328.2483
Fax: (203) 978.2652
crystal.kora@glencore-us.com
Yahoo IM: crystalkora
(See attached file: 2103063D.pdf)


LEGAL DISCLAIMER. The contents of this e-mail and any attachments are strictly
confidential and they may not be used or disclosed by someone who is not a
named recipient.
If you have received this email in error please notify the sender by replying
to this email inserting the word "misdirected" as the message and delete this
e-mail from your system.


2103063D.pdf (29.8 KB)

# Glencore Ltd.

STAMFORD

**DECEMBER 22, 2009**
**\*AMENDMENT\***

**To:**   Degussa Engineered Carbons L.P.

**Fax:**

**Attn:**   Contract Administrator

**Cc:**

**Re:**   Sale of No. 6 Fuel Oil

For Internal Use Only
Contracts   _____
Traffic   _____

Operations   _____

L/C   _____

Trader   _____

DEM   _____

*Amending the price section.

This sales contract confirms the agreement negotiated on Dec 17, 2009 between Evonik Degussa GmbH and Glencore Ltd regarding the sale of No. 6 Fuel Oil on the following terms and conditions:

**Contract No:**   2103063/62/61/60/59/58

**1. Buyer:**   Degussa Engineered Carbons L.P.

**2. Seller:**   Glencore Ltd
Three Stamford Plaza
301 Tresser Boulevard
Stamford CT 06901-3244
USA

**3. Product:**   No. 6 Fuel Oil

**4. Quantity:**   To Orange: Approximately 96,000 barrels total in three monthly liftings of 32,000 barrels each, Jan-Mar 2010.

To Ivanhoe: Approximately 288,000 barrels total in a total of nine 32,000 barrel liftings, three liftings per month, Jan-Mar 2010.

Quantity to be based on static shore tank(s) net upgauge(s) figures at discharge port.

If the independent inspector, agreed by both parties, in his sole discretion, determines that the shore tank upgauge figure(s) are inaccurate for any reason, including but not limited to active shore tank(s) or shore tank(s) in the critical zone, quantity shall be determined by vessel arrival figures with VEF applied for full cargoes, or vessel discharge figure with VEF applied for part cargoes.

**5. Quality:**

Conforming to typical specifications for No. 6 Fuel Oil

Please see attachments A and B

Quality to be based on the mutually agreed independent inspector's analysis of the barge composite sample, prior to discharge.

**6. Price:**

Evonik agrees to make a provisional payment within 7 US banking days of invoice, with parent company guarantee in place.

January Orange price to be based on Platts US Market Scan Gulf Coast Waterbourne - No 6 3.0 - Low for the specific date range of Jan 01 through Jan 31, 2010 inclusive, plus USD 0.5000 per barrel

February Orange price to be based on Platts US Market Scan Gulf Coast Waterbourne - No 6 3.0 - Low for the specific date range of Feb 01 through Feb 28, 2010 inclusive, plus USD 0.5000 per barrel

March Orange price to be based on Platts US Market Scan Gulf Coast Waterbourne - No 6 3.0 - Low for the specific date range of Mar 01 through Mar 31, 2010 inclusive, plus USD 0.5000 per barrel

January Ivanhoe price to be based on Platts US'scan Gulf W/B - No 6 3.0 - Low for the specific date range of Jan 01 through Jan 31, 2010 inclusive

February Ivanhoe price to be based on Platts US'scan Gulf W/B - No 6 3.0 - Low for the specific date range of Feb 01 through Feb 28, 2010 inclusive

March Ivanhoe price to be based on Platts US'scan Gulf W/B - No 6 3.0 - Low for the specific date range of Mar 01 through Mar 31, 2010 inclusive.

**7. Delivery:**

DDP basis one safe port/berth Orange via seller's barge 'TBN' or suitable substitute subject to buyer's approval which shall not be unreasonably withheld, scheduled during Jan, Feb and Mar 2010 as mutually agreed between buyer and seller.

DDP basis one safe port/berth IVANHOE via seller's barge 'TBN' or suitable substitute subject to buyer's approval which shall not be unreasonably withheld, scheduled during Jan, Feb and Mar 2010 as mutually agreed between buyer and seller.

8. Title:

Title and risk of loss and contamination shall pass to the buyer at the time the product passes through the outgoing flange connection of the delivering vessel/barge at discharge port.

**9. Payment:**

To be made within 7 US Banking days after receipt of invoice.

Evonik and Glencore agree to net settle the amounts due regarding this contract. Therefore, any monetary amounts which become due and owing to one Party shall be set off or netted against monetary amounts which become due and owing to the other Party on an on-going basis during the term of the Contracts. The separate prices attributable to each purchase and/or sale of Product between the Parties shall not be payable in gross, but rather shall be payable only on a net basis.

The Parties shall continue to issue invoices to each other as set forth in the Contract(s). Three (3) days after completion of the contracts (the ¿Settlement Date¿), each Party shall confirm, in writing or by telephone, the invoice amount and total amounts owed by each other. The Net Balance shall be payable on the Settlement Date. Payment shall be made by wire transfer in U.S. dollars to the account designated by the recipient on or before the Settlement Date.

10. Taxes:

Any non-income taxes, duties, fees, dues, or other imposts incurred by seller which arise in connection with the sale and supply of the oil for taxes now or hereafter imposed by federal, state or local governments and customarily paid by buyer to seller shall be for the account of buyer.

Upon receipt of invoice, buyer shall reimburse seller the sum of any such taxes, duties, or imposts which seller is required to pay or which directly or indirectly increases the cost to seller of the oil to be purchased and sold hereunder, irregardless of final destination except for NY, NJ or Federal Spill Taxes.

If buyer is entitled to purchase products free of any tax, fee or charge, buyer shall furnish to seller proper exemption certificates to cover such purchases prior to the delivery date.

## 11. All other terms:

As Glencore is the selling party in this transaction, and as per standard industry practice, Glencore's contract along with Glencore Ltd's general terms and conditions dated October 2005 with amendments made in July 2008 and July 2009 shall govern the terms of this transaction. If any of the above is contrary to your understanding of our agreement, please respond immediately by fax with your specific points of disagreement (not a full contract) to seller's fax number indicated on this contract. Glencore Ltd. will not accept any notices sent to any other number and will not be responsible for any costs or liabilities resulting therefrom. In the event no such notification is received by the close of business on the next working day following the date of this contract, the provisions set forth in Glencore's contract shall be binding upon both parties without modification or substitution.

## 12. Glencore Ltd. contact information:

Operations:   Andy Dietterle
Office:        203-328-4937
Portable:     203-918-0236
Fax:          203-978-2667
E-mail:       andy.dietterle@glencore-us.com

# Glencore Ltd.

| | |
|---|---|
| Operations: | Mike Rice |
| Office: | 713-346-2038 |
| Cell: | 713-263-4421 |
| E-mail: | mike.rice@glencore-us.com |

| | |
|---|---|
| Invoices: | Eunice Mosqueda |
| Office: | 713-346-2069 |
| Fax: | 203-978-2627 |
| E-mail: | eunice.mosqueda@glencore-us.com |

| | |
|---|---|
| Finance: | Anna Holmdin |
| Office: | 203-328-4998 |
| Fax: | 203-328-2456 |
| E-mail: | anna.holmdin@glencore-us.com |

| | |
|---|---|
| Contracts: | Samantha M. O'Connell |
| Office: | 203-353-2754 |
| Fax: | 203-978-2652 |
| E-mail: | samantha.oconnell@glencore-us.com |

| | |
|---|---|
| Demurrage: | Kevin Mannion |
| Office: | 203-328-2422 |
| Fax: | 203-978-2659 |
| E-mail: | kevin.mannion@glencore-us.com |

For the sake of good order, please note that the terms of this transaction shall be agreed solely between the parties and that any broker's confirmation and buyer's contract or fax referencing the details of this transaction is for informational purposes only.

Regards,
Glencore Ltd
Contracts Department
Fax: 203-978-2652

brian.saucier@evo
nik.com

01/05/2010 09:41
AM

To
Samantha.Oconnell@glencore-us.com
cc
coleman.conkling@glencore-us.com
Subject
Re: Fw: Scan from a Xerox
WorkCentre

Samantha,
We are still Degussa Engineered Carbons, LP...
Can you change that so I can get PCG in place?

Brian Saucier
Vice President Energy Management NAFTA

Inorganic Materials
Telephone  +1 832-445-3313
Telefax     +1 832-445-3334
Mobile      +1 713-598-7299
brian.saucier@evonik.com

Evonik Degussa Corporation
7702 FM 1960 East Suite 100
Humble, TX 77346 USA
www.evonik.com

Samantha Oconnell/stamford/glen
<Samantha.Oconnell@glencore-us.com>

                                    To
                         brian.saucier@
          evonik.com
                         cc

                         Subject
12/23/2009 09:13 AM      Fw: Scan from
                         a Xerox
                         WorkCentre

(See attached file: Scan001.PDF)

LEGAL DISCLAIMER. The contents of this e-mail and any attachments are
strictly
confidential and they may not be used or disclosed by someone who is not a
named recipient.
If you have received this email in error please notify the sender by
replying
to this email inserting the word "misdirected" as the message and delete
this
e-mail from your system.
(See attached file: Scan001.PDF)(See attached file: Scan001.PDF)


Scan001.PDF (203 KB)

# Glencore Ltd.

**STAMFORD**                                                **DECEMBER 22, 2009**

| | | |
|---|---|---|
| **To:** | Evonik Degussa GmbH | For Internal Use Only |

For Internal Use Only
Contracts _____
Traffic _____

**Fax:**                                                       Operations _____

**Attn:**   Contract Administrator                            L/C _____

**Cc:**                                                        Trader _____

**Re:**   Sale of No. 6 Fuel Oil                              DEM _____

This sales contract confirms the agreement negotiated on Dec 17, 2009 between Evonik Degussa GmbH and Glencore Ltd regarding the sale of No. 6 Fuel Oil on the following terms and conditions:

**Contract No:**  2103063/62/61/60/59/58

**1. Buyer:**    Evonik Degussa GmbH

**2. Seller:**   Glencore Ltd
Three Stamford Plaza
301 Tresser Boulevard
Stamford CT 06901-3244
USA

**3. Product:**  No. 6 Fuel Oil

**4. Quantity:**  To Texas: Approximately 96,000 barrels total in three monthly liftings of 32,000 barrels each, Jan-Mar 2010.

To Ivanhoe: Approximately 288,000 barrels total in a total of nine 32,000 barrel liftings, three liftings per month, Jan-Mar 2010.

Quantity to be based on static shore tank(s) net upgauge(s) figures at discharge port.

If the independent inspector, agreed by both parties, in his sole discretion, determines that the shore tank upgauge figure(s) are inaccurate for any reason, including but not limited to active shore tank(s) or shore tank(s) in the critical zone, quantity shall be determined by vessel arrival figures with VEF applied for full cargoes, or vessel discharge figure with VEF applied for part cargoes.

**5. Quality:**

Conforming to typical specifications for No. 6 Fuel Oil

Please see attachments A and B

Quality to be based on the mutually agreed independent inspector's analysis of the barge composite sample, prior to discharge.

**6. Price:**

# Glencore Ltd.

Evonik agrees to make a provisional payment within 7 days of invoice, with parent company guarantee in place.

January  Texas price to be based on Platts US'scan Gulf W/B - No 6 3.0 - Low for the specific date range of Jan 01 through Jan 31, 2010 inclusive, plus USD 0.5000 per barrel

February  Texas price to be based on Platts US'scan Gulf W/B - No 6 3.0 - Low for the specific date range of Feb 01 through Feb 28, 2010 inclusive, plus USD 0.5000 per barrel

March  Texas price to be based on Platts US'scan Gulf W/B - No 6 3.0 - Low for the specific date range of Mar 01 through Mar 31, 2010 inclusive, plus USD 0.5000 per barrel

January  Ivanhoe price to be based on Platts US'scan Gulf W/B - No 6 3.0 - Low for the specific date range of Jan 01 through Jan 31, 2010 inclusive

February  Ivanhoe price to be based on Platts US'scan Gulf W/B - No 6 3.0 - Low for the specific date range of Feb 01 through Feb 28, 2010 inclusive

March  Ivanhoe price to be based on Platts US'scan Gulf W/B - No 6 3.0 - Low for the specific date range of Mar 01 through Mar 31, 2010 inclusive

## 7. Delivery:

DDP basis one safe port/berth TEXAS via seller's barge 'TBN' or suitable substitute subject to buyer's approval which shall not be unreasonably withheld, scheduled during Jan, Feb and Mar 2010 as mutually agreed between buyer and seller.

DDP basis one safe port/berth IVANHOE via seller's barge 'TBN' or suitable substitute subject to buyer's approval which shall not be unreasonably withheld, scheduled during Jan, Feb and Mar 2010 as mutually agreed between buyer and seller.

## 8. Title:

Title and risk of loss and contamination shall pass to the buyer at the time the product passes through the outgoing flange connection of the delivering vessel/barge at discharge port.

## 9. Payment:

To be made within 7 US Banking days after receipt of invoice

## 10. Taxes:

Any non-income taxes, duties, fees, dues, or other imposts incurred by seller which arise in connection with the sale and supply of the oil for taxes now or hereafter imposed by federal, state or local governments and customarily paid by buyer to seller shall be for the account of buyer.

Upon receipt of invoice, buyer shall reimburse seller the sum of any such taxes, duties, or imposts which seller is required to pay or which directly or indirectly increases the cost to seller of the oil to be purchased and sold hereunder, irregardless of final destination except for NY, NJ or Federal Spill Taxes.

Glencore Ltd.

If buyer is entitled to purchase products free of any tax, fee or charge, buyer shall furnish to seller proper exemption certificates to cover such purchases prior to the delivery date.

**11. All other terms:**

As Glencore is the selling party in this transaction, and as per standard industry practice, Glencore's contract along with Glencore Ltd's general terms and conditions dated October 2005 with amendments made in July 2008 and July 2009 shall govern the terms of this transaction. If any of the above is contrary to your understanding of our agreement, please respond immediately by fax with your specific points of disagreement (not a full contract) to seller's fax number indicated on this contract. Glencore Ltd. will not accept any notices sent to any other number and will not be responsible for any costs or liabilities resulting therefrom. In the event no such notification is received by the close of business on the next working day following the date of this contract, the provisions set forth in Glencore's contract shall be binding upon both parties without modification or substitution.

**12. Glencore Ltd. contact information:**

| | |
|---|---|
| Operations: | Andy Dietterle |
| Office: | 203-328-4937 |
| Portable: | 203-918-0236 |
| Fax: | 203-978-2667 |
| E-mail: | andy.dietterle@glencore-us.com |

| | |
|---|---|
| Operations: | Mike Rice |
| Office: | 713-346-2038 |
| Cell: | 713-263-4421 |
| E-mail: | mike.rice@glencore-us.com |

| | |
|---|---|
| Invoices: | Eunice Mosqueda |
| Office: | 713-346-2069 |
| Fax: | 203-978-2627 |
| E-mail: | eunice.mosqueda@glencore-us.com |

| | |
|---|---|
| Finance: | Anna Holmdin |
| Office: | 203-328-4998 |
| Fax: | 203-328-2456 |
| E-mail: | anna.holmdin@glencore-us.com |

| | |
|---|---|
| Contracts: | Samantha M. O'Connell |
| Office: | 203-353-2754 |
| Fax: | 203-978-2652 |
| E-mail: | samantha.oconnell@glencore-us.com |

# Glencore Ltd.

| | |
|---|---|
| Demurrage: | Kevin Mannion |
| Office: | 203-328-2422 |
| Fax: | 203-978-2659 |
| E-mail: | kevin.mannion@glencore-us.com |

For the sake of good order, please note that the terms of this transaction shall be agreed solely between the parties and that any broker's confirmation and buyer's contract or fax referencing the details of this transaction is for informational purposes only.

Regards,
Glencore Ltd
Contracts Department
Fax: 203-978-2652

A   Evonik —   Ivanhoe

Rubber oil slate - C

| Method | Test / Property | Min. / Max. |
|---|---|---|
| D 287 / D 1298 | API Gravity @ 60°F | - 6.0 / - 1.0 |
| D 445 / D 2161 | Viscosity, Kinematic SUS @ 210 ° F | 110.0 Max. |
| D 4294 | Sulfur, Wt.% | 4.0 Max. |
| D 93B | Flash (PMCC) Degree °F | 140 min. |
| D 95 | Water by Distillation, Vol. % | 0.5 Max. |
| D 482 | Ash, Wt. % | 0.08 Max. |
| IP 143 / D 3279 | Asphaltenes, Wt. % | 8.0 Max. |
| D 5863A | Sodium, PPM | 10.0 Max. |
| D 5863A | Potassium, PPM | 2.0 Max. |
| IP 377 | Aluminum, PPM | 100 Max. |
| IP 377 | Silicon, PPM | 100 Max. |
| D 5863A | Nickel, PPM | 40 Max. |
| D 5863A | Vanadium, PPM | 40 Max. |
| D 5291 | Carbon, Wt. % | Yield guideline 89 min. |
| D 5291 | Hydrogen, Wt. % | Yield reference |
| D 5291 | Nitrogen, Wt. % | Monitor for permit |
| PPC 7041-BF | Toluene insoluble, Wt.% | 0.1 Max. |
| DSOP 9.30.50 | Sieve Residue, PPM | 50 Max. |
| D 189 | Carbon Residue, Conradson, Wt.% | 10 Max. |
| DSOP 9.30.70 | Paraffins, Wt. % | 12.0 Max. |

B   Euonik-   ORANGE

Rubber oil slate

| Method | Test / Property | Min. / Max. |
|---|---|---|
| D 287 / 1298 | API Gravity @ 60°F | - 6.0 / - 1.0 |
| D 445 / 2161 | Viscosity, Kinematic SUS @ 210 ° F | 90.0 Max. |
| D 4294 | Sulfur, Wt.% | 3.0  3.2 Max. |
| D 93B | Flash (PMCC) Degree °F | 140 min. |
| D 95 | Water by Distillation, Vol. % | 0.5 Max. |
| D 482 | Ash, Wt. % | 0.08 Max. |
| IP 143 / D 3279 | Asphaltenes, Wt. % | 8.0 Max. |
| D 5863A | Sodium, PPM | 10.0 Max. |
| D 5863A | Potassium, PPM | 2.0 Max. |
| IP 377 | Aluminum, PPM | 100 Max. |
| IP 377 | Silicon, PPM | 100 Max. |
| D 5863A | Nickel, PPM | 40 Max. |
| D 5863A | Vanadium, PPM | 40 Max. |
| D 5291 | Carbon, Wt. % | Yield guideline 89 min. |
| D 5291 | Hydrogen, Wt. % | Yield reference |
| D 5291 | Nitrogen, Wt. % | Monitor for permit |
| PPC 7041-BF | Toluene insoluble, Wt.% | 0.1 Max. |
| DSOP 9.30.50 | Sieve Residue, PPM | 50 Max. |
| D 189 | Carbon Residue, Conradson, Wt.% | 10 Max. |
| DSOP 9.30.70 | Paraffins, Wt. % | 12.0 Max.. |

From:      Crystal Kora/stamford/glen
To:    brian.saucier@evonik.com
Date:      07/02/2010 03:18 PM
Subject:   Sale - Degussa Engineered Carbons, LP - Contract: 2280015,
           2280016, 2280017, 2280018, 2280069, 2280070, 2280074, 2280078,
           2280079 (AMENDMENT)


Crystal Kora
Glencore Ltd.
Tel: (203) 328.2483
Fax: (203) 978.2652
crystal.kora@glencore-us.com
Yahoo IM: crystalkora
(See attached file: 2280015C.pdf)


LEGAL DISCLAIMER. The contents of this e-mail and any attachments are strictly
confidential and they may not be used or disclosed by someone who is not a
named recipient.
If you have received this email in error please notify the sender by replying

to this email inserting the word "misdirected" as the message and delete this
e-mail from your system.

2280015C.pdf (29.8 KB)

# Glencore Ltd.

STAMFORD

JULY   2, 2010
*AMENDMENT*

**To:**   Degussa Engineered Carbons, LP

For Internal Use Only
Contracts _____
Traffic   _____

**Fax:**

Operations _____

**Attn:**   Contract Administrator

L/C   _____

**Cc:**   N/A

Trader   _____

**Re:**   Sale of No. 6 Fuel Oil

DEM   _____

*Amendment to Quality Section.

This sales contract confirms  the agreement negotiated on Jun 25, 2010 between Degussa Engineered Carbons, LP and Glencore Ltd regarding the sale of No. 6 Fuel Oil on the following terms and conditions:

**Contract No:**  2280015, 2280016, 2280017, 2280018, 2280069, 2280070, 2280074, 2280078, 2280079

**1. Buyer:**   Degussa Engineered Carbons, LP

**2. Seller:**   Glencore Ltd
Three Stamford Plaza
301 Tresser Boulevard
Stamford CT 06901-3244
USA

**3. Product:**   No. 6 Fuel Oil

**4. Quantity:**   270,000 barrels, +/-5%

Quantity to be based on static shore tank(s) net upgauge(s) figures at discharge port.

If the independent inspector, agreed by both parties, in his sole discretion, determines that the shore tank upgauge figure(s) are inaccurate for any reason, including but not limited to active shore tank(s) or shore tank(s) in the critical zone, quantity shall be determined by vessel arrival figures with VEF applied for full cargoes, or vessel discharge figure with VEF applied for part cargoes.

**5. Quality:**

* Conforming with Attachment A.

Quality to be based on the mutually agreed independent inspector's analysis of the barge composite sample, prior to discharge.

**6. Price:**

Degussa Engineered Carbons, LP agrees to make a provisional payment within seven (7) days of the invoice, with Evonik parent company guarantee in place.

**JULY DELIVERY**
Price to be based on Platts US MarketScan Gulf Coast Waterbourne - No. 6 3.0 % - Low for the specific date range of July 01, 2010 through July 31, 2010 inclusive, plus USD 2.6500 per barrel.

**AUGUST DELIVERY**
Price to be based on Platts US MarketScan Gulf Coast Waterbourne - No. 6 3.0 % - Low for the specific date range of August 01, 2010 through August 31, 2010 inclusive, plus USD 2.6500 per barrel.

**SEPTEMBER DELIVERY**
Price to be based on Platts US MarketScan Gulf Coast Waterbourne - No. 6 3.0 % - Low for the specific date range of September 01, 2010 through September 30, 2010 inclusive, plus USD 2.6500 per barrel.

**7. Delivery:**

DDP basis one safe port/berth IVANHOE, LOUISIANA via seller's barge 'TBN' or suitable substitute subject to buyer's approval which shall not be unreasonably withheld, scheduled

90,000 barrels between July 1-31, 2010 as mutually agreed between Buyer and Seller.

90,000 barrels between August 1-31, 2010 as mutually agreed between Buyer and Seller.

90,000 barrels between September 1-30, 2010 as mutually agreed between Buyer and Seller.

8. Title:

Title and risk of loss and contamination shall pass to the Buyer at the time the product passes through the outgoing flange connection of the delivering vessel/barge at discharge port.

**9. Payment:**

To be made within seven (7) US Banking Days after Discharge.

10. Taxes:

Any non-income taxes, duties, fees, dues, or other imposts incurred by Seller which arise in connection with the sale and supply of the oil for taxes now or hereafter imposed by federal, state or local governments and customarily paid by Buyer to Seller shall be for the account of Buyer.

Upon receipt of invoice, Buyer shall reimburse Seller the sum of any such taxes, duties, or imposts which Seller is required to pay or which directly or indirectly increases the cost to Seller of the oil to be purchased and sold hereunder, irregardless of final destination except for New York, New Jersey, or Federal Spill Taxes.

If Buyer is entitled to purchase products free of any tax, fee or charge, Buyer shall furnish to Seller proper exemption certificates to cover such purchases prior to the delivery date.

# Glencore Ltd.

**11. All other terms:**

As Glencore is the selling party in this transaction, and as per standard industry practice, Glencore's contract along with Glencore Ltd's general terms and conditions dated October 2005 with amendments made in July 2008 and July 2009 shall govern the terms of this transaction. If any of the above is contrary to your understanding of our agreement, please respond immediately by fax with your specific points of disagreement (not a full contract) to seller's fax number indicated on this contract. Glencore Ltd. will not accept any notices sent to any other number and will not be responsible for any costs or liabilities resulting therefrom. In the event no such notification is received by the close of business on the next working day following the date of this contract, the provisions set forth in Glencore's contract shall be binding upon both parties without modification or substitution.

**12. Glencore Ltd. contact information:**

Operations:     Jeff Henderson
Office:          713-331-3288
Portable:        281-224-5536
Fax:             713-751-7975
E-mail:          jeffrey.henderson@glencore-us.com

Invoices:       Meg Phillips
Office:          713-346-2032
Fax:             203-978-2627
E-mail:          meg.phillips@glencore-us.com

Finance:        Anna Holmdin
Office:          203-328-4998
Fax:             203-328-2456
E-mail:          anna.holmdin@glencore-us.com

Contracts:      Crystal Kora
Office:          203-328-2483
Fax:             203-978-2652
E-mail:          stamford.contracts@glencore-us.com

Demurrage:      Kevin Mannion
Office:          203-328-2422
Fax:             203-978-2659

Vessel Claims:
All vessel claims should be sent to the following e-mail address:
demurrage@glencore-us.com

Barge Claims:
All barge claims should be sent to the following e-mail address:
bargeclaims@glencore-us.com

# Glencore Ltd.

For the sake of good order, please note that the terms of this transaction shall be agreed solely between the parties and that any broker's confirmation and buyer's contract or fax referencing the details of this transaction is for informational purposes only.

Regards,
Glencore Ltd
Contracts Department
Fax: 203-978-2652

From:      Crystal Kora/stamford/glen
To:    brian.saucier@evonik.com
Date:      06/29/2010 03:21 PM
Subject:   Sale - Degussa Engineered Carbons, LP - Contract: 2280015,
           2280016, 2280017, 2280018, 2280069, 2280070, 2280074, 2280078,
           2280079


Crystal Kora
Glencore Ltd.
Tel: (203) 328.2483
Fax: (203) 978.2652
crystal.kora@glencore-us.com
Yahoo IM: crystalkora
(See attached file: 2280015A.pdf)


LEGAL DISCLAIMER. The contents of this e-mail and any attachments are strictly confidential and they may not be used or disclosed by someone who is not a named recipient.
If you have received this email in error please notify the sender by replying

to this email inserting the word "misdirected" as the message and delete this
e-mail from your system.



2280015A.pdf (29.4 KB)

# Glencore Ltd.

**STAMFORD**                                                    **JUNE    28, 2010**

| | | |
|---|---|---|
| **To:** | Degussa Engineered Carbons, LP | For Internal Use Only |

For Internal Use Only
Contracts _____
Traffic _____

**Fax:**                                                         Operations _____

**Attn:**  Contract Administrator                                L/C _____

**Cc:**   N/A                                                    Trader _____

**Re:**   Sale of No. 6 Fuel Oil                                 DEM _____

This sales contract confirms the agreement negotiated on Jun 25, 2010 between Degussa Engineered Carbons, LP and Glencore Ltd regarding the sale of No. 6 Fuel Oil on the following terms and conditions:

**Contract No:** 2280015, 2280016, 2280017, 2280018, 2280069, 2280070, 2280074, 2280078, 2280079

**1. Buyer:**    Degussa Engineered Carbons, LP

**2. Seller:**   Glencore Ltd
Three Stamford Plaza
301 Tresser Boulevard
Stamford CT 06901-3244
USA

**3. Product:**   No. 6 Fuel Oil

**4. Quantity:**  270,000 barrels, +/-5%

Quantity to be based on static shore tank(s) net upgauge(s) figures at discharge port.

If the independent inspector, agreed by both parties, in his sole discretion, determines that the shore tank upgauge figure(s) are inaccurate for any reason, including but not limited to active shore tank(s) or shore tank(s) in the critical zone, quantity shall be determined by vessel arrival figures with VEF applied for full cargoes, or vessel discharge figure with VEF applied for part cargoes.

**5. Quality:**

Conforming to typical specifications for No. 6 Fuel Oil

Quality to be based on the mutually agreed independent inspector's analysis of the barge composite sample, prior to discharge.

**6. Price:**

Degussa Engineered Carbons, LP agrees to make a provisional payment within seven (7) days of the invoice, with Evonik parent company guarantee in place.

JULY DELIVERY
Price to be based on Platts US MarketScan Gulf Coast Waterbourne - No. 6 3.0 % - Low for the specific date range of July 01, 2010 through July 31, 2010 inclusive, plus USD 2.6500 per barrel.

Glencore Ltd.

AUGUST DELIVERY
Price to be based on Platts US MarketScan Gulf Coast Waterbourne - No. 6 3.0 % - Low for the specific date range of August 01, 2010 through August 31, 2010 inclusive, plus USD 2.6500 per barrel.

SEPTEMBER DELIVERY
Price to be based on Platts US MarketScan Gulf Coast Waterbourne - No. 6 3.0 % - Low for the specific date range of September 01, 2010 through September 30, 2010 inclusive, plus USD 2.6500 per barrel.

**7. Delivery:**

DDP basis one safe port/berth IVANHOE, LOUISIANA via seller's barge 'TBN' or suitable substitute subject to buyer's approval which shall not be unreasonably withheld, scheduled

90,000 barrels between July 1-31, 2010 as mutually agreed between Buyer and Seller.

90,000 barrels between August 1-31, 2010 as mutually agreed between Buyer and Seller.

90,000 barrels between September 1-30, 2010 as mutually agreed between Buyer and Seller.

8. Title:

Title and risk of loss and contamination shall pass to the Buyer at the time the product passes through the outgoing flange connection of the delivering vessel/barge at discharge port.

**9. Payment:**

To be made within seven (7) US Banking Days after Discharge.

10. Taxes:

Any non-income taxes, duties, fees, dues, or other imposts incurred by Seller which arise in connection with the sale and supply of the oil for taxes now or hereafter imposed by federal, state or local governments and customarily paid by Buyer to Seller shall be for the account of Buyer.

Upon receipt of invoice, Buyer shall reimburse Seller the sum of any such taxes, duties, or imposts which Seller is required to pay or which directly or indirectly increases the cost to Seller of the oil to be purchased and sold hereunder, irregardless of final destination except for New York, New Jersey, or Federal Spill Taxes.

If Buyer is entitled to purchase products free of any tax, fee or charge, Buyer shall furnish to Seller proper exemption certificates to cover such purchases prior to the delivery date.

**11. All other terms:**

As Glencore is the selling party in this transaction, and as per standard industry practice, Glencore's contract along with Glencore Ltd's general terms and conditions dated October 2005 with amendments made in July 2008 and July 2009 shall govern the terms of this transaction. If any of the above is contrary to your understanding of our agreement, please respond immediately by fax with your specific points of disagreement (not a full contract) to seller's fax number indicated on this contract. Glencore Ltd. will not accept any notices sent to any other number and will not be responsible for any costs or liabilities resulting therefrom. In the event no such notification is received by the close of business on the next working day following the date of this contract, the provisions set forth in Glencore's contract shall be binding upon both parties without modification or substitution.

**12. Glencore Ltd. contact information:**

| | |
|---|---|
| Operations: | Jeff Henderson |
| Office: | 713-331-3288 |
| Portable: | 281-224-5536 |
| Fax: | 713-751-7975 |
| E-mail: | jeffrey.henderson@glencore-us.com |

| | |
|---|---|
| Invoices: | Meg Phillips |
| Office: | 713-346-2032 |
| Fax: | 203-978-2627 |
| E-mail: | meg.phillips@glencore-us.com |

| | |
|---|---|
| Finance: | Anna Holmdin |
| Office: | 203-328-4998 |
| Fax: | 203-328-2456 |
| E-mail: | anna.holmdin@glencore-us.com |

| | |
|---|---|
| Contracts: | Crystal Kora |
| Office: | 203-328-2483 |
| Fax: | 203-978-2652 |
| E-mail: | stamford.contracts@glencore-us.com |

| | |
|---|---|
| Demurrage: | Kevin Mannion |
| Office: | 203-328-2422 |
| Fax: | 203-978-2659 |

Vessel Claims:
All vessel claims should be sent to the following e-mail address:
demurrage@glencore-us.com

Barge Claims:
All barge claims should be sent to the following e-mail address:
bargeclaims@glencore-us.com

# Glencore Ltd.

For the sake of good order, please note that the terms of this transaction shall be agreed solely between the parties and that any broker's confirmation and buyer's contract or fax referencing the details of this transaction is for informational purposes only.

Regards,
Glencore Ltd
Contracts Department
Fax: 203-978-2652

# GLENCORE Ltd.

## General Terms and Conditions
## For Product(s) Purchases/Sales and Exchange

THESE GENERAL TERMS AND CONDITIONS SHALL BE APPLICABLE TO ALL CONTRACTS AND THE PERFORMANCE OF CONTRACTS FOR PURCHASES, SALES AND EXCHANGES OF BULK VOLUMES OF PRODUCTS INCLUDING CRUDE OIL, REFINERY FEEDSTOCK, REFINERY INTERMEDIATE AND REFINED PETROLEUM PRODUCTS. TO THE EXTENT THAT ANY TERMS AND CONDITIONS CONTAINED IN THE SALES CONFIRMATION, AGREED TO BETWEEN THE PARTIES, CONFLICT WITH THE TERMS OF THIS DOCUMENT, THE CONDITIONS SET FORTH AND AGREED TO BY BOTH PARTIES IN THE SALES CONFIRMATION SHALL PREVAIL.

1. DEFINITIONS.

   "Agreement" means these terms and conditions together with the mutually agreed upon Sales Confirmation;

   "ASTM" means ASTM International or the American Society of Testing and Materials.

   "Barrel" or "BBL" means 42 U.S. gallons adjusted to a temperature of sixty (60) degrees Fahrenheit in compliance with the applicable A.S.T.M. methods;

   "Berth" means a safe and customary place in which a party may engage in cargo operations including but not limited to berths, sea buoys, or wharfs;

   "Buyer" means a party obligated to buy Product(s) (as hereinafter defined) under this Agreement;

   "Gallon" means a U.S. gallon of two hundred thirty-one (231) cubic inches adjusted to a temperature of sixty (60) degrees Fahrenheit in compliance with the applicable A.S.T.M. methods;

   "Independent Inspector" means an independent petroleum inspector appointed by agreement of the Parties, mutually acceptable to both parties, the cost of which shall be borne equally by both parties, which results are final and binding on both parties;

   "Month" means a calendar month;

   "New York Banking Day" means a day (other than a Saturday or Sunday) on which banks are authorized to open for business in New York, the United States of America;

   "Product(s)" means crude oil, refinery feedstock, refinery intermediate products, and refined petroleum products which is/are the subject of this Agreement;

   "Sales Confirmation" means the mutually agreed upon written instrument of the specific terms of a transaction between the parties;

   "Seller" means a party obligated to sell Product(s) under this Agreement;

   "Vessel Party" means the party to the Agreement which holds or takes title to the Product on a marine vessel;

   "Year" means a calendar year ending with the 31st day of December, unless otherwise specially defined.

2.    TITLE AND RISK OF LOSS.

Title to, risk of loss, liability and contamination for Product(s) delivered hereunder shall pass upon delivery, as defined by Incoterms 2000, for the delivery terms specified in the Sales Confirmation. Seller is not responsible for any damages arising from delay beyond its reasonable control including, but not limited to, the late arrival of the vessel/barge or other modes of transport for purposes of delivery.

3.    WARRANTY.

Except for conformance to the Product specifications set forth in this Agreement, Seller makes no warranty of any kind, express or implied, including, without limitation, any warranty of merchantability or fitness or suitability of the product for a particular purpose.

4.    LIMITATION OF LIABILITY.

In no event shall either party be liable for any incidental, exemplary, consequential, punitive, or indirect or special losses or damages of any kind arising out of or in any way connected with the performance of or failure to perform this Agreement, including, but not limited to, lost profits, loss of production or losses resulting from shutdown of plants, or inability to perform sales or any other contracts arising out of or in connection with the performance or nonperformance of this Agreement.  Seller's liability with respect to the Agreement or any action in connection herewith whether in agreement, tort or otherwise shall not exceed price of the Product(s) sold under the Agreement. Claims as to shortage in quantity, defects in quality, or any others, except for demurrage or shifting, shall be made by written notice to the other party no later than ninety (90) days after the delivery in question or shall be deemed to have been waived. Further, any legal actions taken to enforce any rights or obligations under the Agreement must be properly filed in a competent court against Seller no later than one (1) year after the alleged breach of the Agreement occurred.

5.    PAYMENT.

Buyer shall make a payment in immediately available, wired funds, without offset, deduction or counterclaim for any reason whatsoever, for full invoice amount into Seller's designated bank account no later than two (2) New York Banking days from Buyer's receipt of Seller's telexed or telecopied invoice and customary and legally required documents.  However, payment shall not be required to be made by Buyer until discharge of the cargo or delivery of the Product(s) sold hereunder is complete.  In the event that discharge of the cargo is delayed through the fault of the Buyer or Buyer's agent, Buyer agrees to pay Seller interest as more fully described below.

In the event that Buyer fails to make any payment when due, then, to the extent permitted by applicable law and without prejudice to the application of any other provision hereof or to any other remedy provided to Seller hereunder or otherwise, interest shall accrue daily on the amount of such overdue payment.  Such interest shall accrue commencing on the date such payment was due, at the rate of two (2) percentage points higher than the published prime lending rate in the Wall Street Journal.

If Buyer fails to make any payment required to be made by it to Seller when and as the same become due and payable, and if the Agreement otherwise calls for further deliveries of Product(s), then, in addition to all other rights and remedies provided to Seller hereunder or otherwise, Seller shall have the right in its sole discretion to

(i) suspend such further deliveries until Buyer makes the required payment together with any accrued interest thereon or

(ii) terminate the Agreement effective immediately upon written notice to Buyer at any time prior to the date of such payment in full.

Further, Seller retains the right to offset any amount due or to become due Seller under the Agreement against any amount due or to become due under any other Agreement between Buyer (and Buyer's affiliates) and Seller and to offset any amount due or to become due Seller under any Agreement between Buyer (and Buyer's affiliates) and Seller against any amount due or to become due under the Agreement.

If Buyer prepaid for the product covered by this contract using a provisional price and/or quality, Seller to determine the final amount due from Buyer to Seller, or Seller to Buyer, by comparing the amount prepaid to the actual contractual value for the product delivered to Buyer should the prepayment amount be greater than the actual contractual amount, buyer will provide an invoice to Seller for the difference and Seller will pay Buyer in immediately available, wired funds, without offset, deduction or counterclaim, for full invoice amount per instructions on Buyer's invoice. Should the prepayment amount be less than the actual contractual value, Seller will provide an invoice to Buyer for the difference, and Buyer will pay Seller in immediately available, wired funds, immediately available, wired funds, without offset, deduction or counterclaim, for full invoice amount per instructions on Seller's invoice. In both cases, such payment to be made by Seller or Buyer as the case may be, within two (2) New York Banking days after receipt of invoice.

If any payment due date falls on a Saturday or non-Monday, New York banking holiday, then such amounts shall be due on the immediately preceding New York banking day. If a payment due date falls on a Sunday or Monday, New York banking holiday, then such payment shall be due on the next succeeding business day.

6.    CREDIT.

Should Seller's exposure to Buyer, under this Agreement, or in combination with Seller's exposure under any other physical contract between Seller and Buyer, exceed Seller's credit limit for Buyer, if any, as decided at the sole discretion of Seller (the "Credit Limit"), Seller reserves the right to require Buyer to provide to Seller either a. or b., at Seller's option:

a.    Buyer to post an irrevocable standby letter of credit, opened by a first class bank, in a format and substance acceptable to Seller not later than three (3) New York banking days prior to the first day of the contractual layday range, ETA of vessel/barge, or book/title transfer date, whichever is earlier. The letter of credit must be confirmed by, or advised through Seller's bank, if so required by Seller. All bank charges levied by Buyer's bank in connection with the standby letter of credit, are for Buyer's account. Notwithstanding the layday range set forth in the contract, the layday range to be included in the letter of credit shall be for an expanded period beginning three days earlier, and ending five days later, than the contractual layday range.

b.    Buyer to prepay 100 percent contract value (including any tolerance and any applicable taxes) to Seller's designated bank account in immediately available funds without offset, deduction or counterclaim, at latest twenty four (24) hours prior to first day of the contractual layday range, ETA of vessel/barge, or book transfer date, whichever is earlier. Settlement of the balance owed (if any, by comparing final amount due from Buyer to Seller with amount prepaid by Buyer to Seller) to be made by the owing party within one (1) New York banking day of receipt of owed party's invoice.

Buyer understands and agrees to increase the amount of the letter of credit or prepayment each and every time that Seller's exposure to Buyer, as determined by Seller, exceeds the Credit Limit plus the amount of the currently available credit under the outstanding letter of credit or amount of prepayment.

In the event that Buyer fails to provide, or amend, the value of the letter of credit or amount of prepayment as required by Seller, Seller shall have the right to suspend its performance or terminate this Agreement, and/or any other agreement(s), between Seller and Buyer. In such case, Buyer shall be obligated to reimburse Seller for any and all losses, incurred by Seller as a result of such suspension(s) or termination(s).

Seller's exposure to Buyer is defined as the total receivable(s) due Seller from Buyer plus the projected net receivable(s), based on Seller's mark-to-market calculation, due Seller from Buyer for deliveries of Product(s).

Seller may, at its option, elect to defer performance of the Agreement or require prompt payment or the opening of a letter of credit, from a bank acceptable to Seller, or require any other acceptable security or collateral, in the event of circumstances which, in the reasonable judgment of Seller, may have an adverse effect on creditworthiness of Buyer and/or Buyer's ability to perform its obligations.

7.     MARINE PROVISIONS.

a.     Terminals. Terminals utilized in receipts or deliveries pursuant to this Agreement shall provide a safe Berth to which vessels may proceed, remain alongside and depart from always safely afloat; and, except as local industry practice may otherwise establish, remain free of all wharfage, dockage and quay dues. Terminals shall Berth vessels under this Agreement on a non-priority basis with all other vessels arriving to load or discharge in order of rotation as determined by the terminal in its sole commercially-reasonable judgment.

b.     Notice. As soon as practical after establishment of this contract, the parties shall consult with each other to narrow the contractual delivery laydays to a delivery window, as found in the Sales Confirmation, acceptable to both parties considering delivery vessel schedule and receiving terminal schedule. The delivering or receiving terminal shall be notified promptly of each vessel nominated under this Agreement in accordance with standard industry practice. For tanker or ocean-going barge movements, where possible, the terminal shall be further notified in writing of arrival time at intervals of seventy-two (72), forty-eight (48) and twenty-four (24) hours in advance of arrival. In addition to the aforedescribed notices, the terminal shall be notified immediately when a scheduled tanker or ocean-going barge arrival time changes by more than three (3) hours. Similarly, for other barge movements, the terminal shall be notified when a scheduled barge arrival time changes by more than one (1) hour.

c.     Notice of Readiness ("NOR"). When a vessel arrives at the customary anchorage or other customary waiting area and is, in all respects, ready to commence loading or discharging, the master or his agent shall tender to the terminal a written NOR.

d.     Pumping.

        (1) Vessel loading: cargo shall be pumped into the cargo tanks of the vessel by the delivering terminal at the terminal's expense. Pumping shall be at the terminal's risk only to the point at which the vessel's hoses are attached to the terminal's lines or, if vessel's hoses are not used, to the permanent hose connections of such vessel.

        (2) Vessel unloading: cargo shall be pumped into the storage tanks of the receiving terminal by the vessel at the vessel's expense. In the case of a vessel transfer to barge, costs shall be at the expense of the vessel. Pumping shall be at terminal's risk only from the point at which the vessel's hoses are attached to terminal's lines or, if the vessel's hoses are not used, from the permanent hose connections of such vessel.

GLENCORE LTD.
General Terms and Conditions
October 2005
4

e.      Barges.  Laytime shall commence from tender of valid NOR, or upon arrival at berth, all fast excluding hoses, whichever occurs first.  Barges arriving outside the contractual window shall be treated on a first come, first-served basis and time will not start until the barge is all fast.  Barges loading and discharging at public terminals are loaded or discharged on a first come, first-served basis only, therefore, laytime shall not commence until the barge is all fast at dock. Seller assumes no responsibility for delays or demurrage incurred until barge is all fast at dock. Laytime or demurrage, if on demurrage, shall end following completion of loading or discharging and disconnection of hoses. Allowed laytime shall be determined by reference to the barge's charter party. Any delays to the barge following tender of NOR for reasons over which the terminal has no control shall not count as used laytime or demurrage, if on demurrage.  For the avoidance of doubt, congestion shall not be considered beyond the control of a terminal.  Any prohibition of loading or discharging by reason of tide or hour that is imposed by port authorities shall not count as used laytime or demurrage, if on demurrage. Charterer shall not be responsible for tug boat demurrage or any incremental costs involving tugs.  Each barge must display the ability to discharge or to receive the entire cargo within allowed laytime and must maintain an average of one hundred (100) psi at barge's rail during and throughout discharge.  All demurrage claims shall include the barge company's pumping log covering the entire discharge.  Any time lost by reason of failure to so pump or to so maintain pressure, as set forth above shall not count as used laytime or demurrage, if on demurrage.  Time lost shall be calculated using the Asdem Pumping Performance Formula to determine the difference between the actual time taken to discharge and the time the vessel would have taken had an average of 100 psi been maintained.  In the event of such failure, terminal reserves the right to remove the barge from berth and to suspend the running of laytime while the barge remains so removed. Except as set forth above, laytime shall be determined in accordance with the applicable charter party.

f.      Tankers.

If FOB:

1.      Laytime shall commence upon the expiration of six (6) hours from tender of NOR, as outlined in 7(c) or upon arrival at Berth, all fast excluding gangway and events thereafter, whichever occurs first. If vessel arrives and tenders NOR before agreed contractual delivery window, laytime shall commence at 0600 on the first day of that window, or all fast, whichever comes first. If vessel arrives and tenders NOR after agreed contractual delivery window, laytime shall commence when vessel is all fast. Laytime or demurrage, if on demurrage, shall end following completion of loading or discharging and disconnection of hoses, however, if awaiting documents onboard  at loadport is in excess of three (3) hours, time to resume until documents are onboard.  Allowed laytime shall be thirty-six (36) running hours for loading or discharging full cargo and pro-rata for any part thereof with minimum twelve (12) hours to apply. The term "full cargo" in the proceeding sentence shall be defined with reference to the totality of the bills of lading issued for the voyage rather than with reference to vessel capacity.  Except as set forth above and in subparagraphs h. and i. below, laytime shall be determined in accordance with the applicable charter party, or if none, in accordance with the Asbatankvoy charter party form. Vessels loading and discharging at public terminals are loaded or discharged on a first come, first-served basis only, therefore, laytime shall not commence until vessel is all fast at dock.  Seller assumes no responsibility for delays or demurrage incurred until vessel is all fast at dock.  The testing of vessel composite quality shall not effect commencement of laytime for demurrage purposes.

2.      Lighterage.  If the draft at the loadport  is more restrictive than the loading vessel's arrival draft, Seller shall be responsible for any lighterage, demurrage, and/or other costs associated with bringing the vessel to the more restrictive draft. This time is to be counted as used laytime, commencing NOR plus 6 or lighter "all fast", whichever occurs first, and shall continue until last lightering unit has completed unmooring.

GLENCORE LTD.
General Terms and Conditions
October 2005
5

3.    Demurrage.  Upon presentation of invoice and all supporting documentation, demurrage shall be payable for each running hour and pro-rata for any part thereof that allowed laytime is exceeded by loading and/or discharging and any other time counting as laytime. The demurrage rate shall be that specified in vessel's charter party, a previously agreed upon demurrage rate, or in the absence thereof, prevailing market rates for a similar vessel on a similar voyage shall apply. Any delays arising from weather conditions or difficulties attributable to Force Majeure as hereinafter defined, at ports or places of loading and/or discharge, shall count as one-half laytime, or if on demurrage, at one half the demurrage rate. Terminal shall not be liable for any demurrage caused by strikes, lockouts, stoppages or restraints of labor by master, officers and crew of the vessel, tugs or pilot boats.  Any claims for demurrage shall be received in writing with full supporting documentation (including but not limited to NOR, statement of facts, pumping records, letters of protest and substantiation of rate used) within ninety (90) days of completion of cargo operations to be valid.  Any claims for demurrage, shifting or other port expense received after ninety (90) day period shall be deemed waived and will be time barred.  Demurrage is as per charter party, rates, terms and conditions.  Demurrage reimbursement will not exceed the actual expense incurred by charterers.  A copy of the actual invoice (not a preliminary invoice) presented to the charterer will be supplied to support the actual expense.

**IF DELIVERED:**

1.    Laytime shall commence upon the expiration of six (6) hours from tender of NOR, as outlined in 7(c) or upon arrival at Berth, all fast excluding gangway and events thereafter, whichever occurs first. Allowed laytime shall be thirty-six (36) running hours for loading or discharging full cargo and pro-rata for any part thereof with no minimum to apply. The term "full cargo" in the proceeding sentence shall be defined with reference to the totality of the bills of lading issued for the voyage rather than with reference to vessel capacity. For the avoidance of doubt, terminal shall be responsible for demurrage in situations, including but not limited to, congestion, the availability of terminal personnel and delay in connecting hoses. The terminal shall be responsible for providing the appropriate number of hoses and connections acceptable to the vessel's manifold.  Each vessel must display the ability to discharge or receive the entire cargo within twenty-four (24) hours for full cargo or pro-rata for any part thereof or must maintain an average of one hundred (100) psi at vessel's manifold during and throughout the bulk discharge, provided shore facilities are capable of receiving same excluding maximum two (2) hours for vessel tank stripping and vessel internal stripping.  Any time lost by reason of failure to so pump or to so maintain the average pressure, as set forth above shall not count as used laytime or demurrage, if on demurrage.  Time lost shall be calculated using the Asdem Pumping Performance Formula to determine the difference between the actual time taken to discharge and the time the vessel would have taken had an average of 100 psi been maintained  In the event of such failure, terminal reserves the right to require the removal of the vessel from berth to suspend the running of laytime or demurrage, if on demurrage, while the vessel remains so removed. Except as set forth above and below in subparagraphs 2 and 3, laytime shall be determined in accordance with the applicable charter party, or if none, in accordance with the Asbatankvoy charter party form.

2.    Lighterage.  If the draft at the discharge port is more restrictive than the discharging vessel's arrival draft, Buyer shall be responsible for any lighterage, demurrage, and/or other costs associated with bringing the vessel to the more restrictive draft.  This time to be counted as used laytime or demurrage, if on demurrage, commencing NOR plus 6 or lighter "all fast", whichever occurs first, and shall continue until last lightering unit has completed unmooring.

3.    Demurrage.  Upon presentation of invoice and all supporting documentation, demurrage shall be payable for each running hour and pro-rata for any part thereof that allowed laytime is exceeded by loading and/or discharging and any other time counting as laytime. The demurrage

rate shall be that specified in vessel's charter party, a previously agreed upon demurrage rate, or in the absence thereof, prevailing market rates for a similar vessel on a similar voyage shall apply. Any delays arising from weather conditions or difficulties attributable to Force Majeure as hereinafter defined, at ports or places of loading and/or discharge, shall count as one-half laytime, or if on demurrage, at one half the demurrage rate. Terminal shall not be liable for any demurrage caused by strikes, lockouts, stoppages or restraints of labor by master, officers and crew of the vessel. Any claims for demurrage shall be received in writing with full supporting documentation (including but not limited to NOR, statement of facts, pumping records, letters of protest and substantiation of rate used) within ninety (90) days of completion of cargo operations to be valid. Any claims received after ninety (90) day period shall be deemed waived and will be time barred. Claims for demurrage, shifting or other port expenses received prior to ninety (90) day timebar, but without the proper documentation included, will be considered registered, however, full documentation shall be submitted before review will commence and final agreement can be reached.

g.     Vessel Compliance. All vessels shall comply fully with all terminal directives as well as with all applicable statutes, rules, regulations, orders, directives and recommendations of any governmental authority federal, state or local relating thereto. Delays of any nature resulting from non-compliance by vessels shall not count as used laytime or demurrage, if on demurrage. The party owning or chartering the vessel shall assure that the vessel holds all applicable environmental compliance and environmental damage insurance certificates, including all necessary certificates of financial responsibilities, for the voyage undertaken.

h.     Nominations. Promptly after agreement between the parties on the vessel loading range, the charterer or owner of the vessel shall notify the other party of the name, size and dimensions of the vessel. In the event that the vessel's characteristics make it unsuitable for the unloading port, the other party shall so notify the charterer or owner of the vessel in writing within twenty-four (24) hours of receiving the nomination, setting forth with particularity the features of the vessel, which makes it unsuitable. Upon receipt of such notice, the charterer or owner of the vessel shall nominate, as promptly as possible, another vessel and advise the other party of any adjustment to the vessel loading range that may be necessary as a result of the nomination. If no such notice is given by other party within twenty-four (24) hours of receiving the nomination, the vessel shall be deemed to be fully acceptable. At any time after the original nomination, the charterer or owner of the vessel may substitute another vessel of similar size and characteristics upon notice to the other party.

Charterer or owner of the vessel warrants and represents that the vessel nominated for other party's acceptance is, and any substitutes are at the time of nomination, acceptance, and while in use for transporting and delivering product, in compliance with all applicable laws and regulations.

i.     Transfers. Seller may procure transportation for the Product(s) and related services on terms entitling ship owners or other parties providing the services to transfer the Product(s) from the Vessel to one or more other vessels by any means.

j.     Determination of Quantity and Quality. The volume of each loading of Product(s) shall be determined at the discharge or load port by an independent inspector selected by mutual agreement of the parties, which resultant fees shall be shared equally by the parties. Measuring, gauging, sampling, and testing shall be performed in accordance with latest industry-accepted standards using ASTM methods for repeatability and reproducibility, and witnessed by an independent inspector, whose fees shall be shared equally between the parties. In addition, Seller may appoint a representative to witness all ullages and tests and to have additional tests run at both the load port and the discharge port with all costs for such items for Seller's account. Independent inspector's results, save for fraud or manifest error, shall be final and binding on both parties.

k.      Bills of Lading.  In the event that bills of lading covering the Product(s) are issued "to order" or in blank and are negotiated by Buyer or otherwise come into possession of, a third party, Seller shall have no liability for, and Buyer shall hold Seller harmless from and against, any claims for misdelivery or any other claims whatsoever arising therefrom.  All bills of lading issued for the Product(s) shall incorporate the terms of the governing charter party regardless of whether such bills contain a stamp to that effect.

8.      SECURITY.

Seller and Buyer warrant that they are in full compliance with the following security regulations:

      1.      International Ship and Port Facility Security (ISPS)

      2.      U. S. Maritime Transportation Security Act of 2002 (MTSA)

9.      FORCE MAJEURE.

If either party is rendered unable by "Force Majeure", or any other cause of any kind not reasonably within its control, and such is not the result of the negligence or misconduct of the party claiming Force Majeure, wholly or in part, to perform or comply with any obligations or conditions of this Agreement, upon such party's giving timely written notice and reasonable full particulars to the other party such obligation or condition shall be suspended during the continuance of the inability so caused and such party shall be relieved of liability and shall suffer no liability for failure to perform the same during such period. Notwithstanding the foregoing, the obligation of either party to pay money to the other shall not be excused or suspended due to Force Majeure.  The cause of the suspension (other than strikes or differences with workmen) shall be remedied as soon as possible with reasonable dispatch.  Settlement of strikes and differences with workmen shall be wholly within the discretion of the party having difficulty.  The party having difficulty shall notify the other party of any changes in circumstances giving rise to the suspension of its performance and of its resumption of performance under this agreement.  The term "Force Majeure" shall include:

a.      Compliance (voluntary or involuntary) with laws, decrees, guidelines, requests, or the like of any government or person purporting to act thereof, or of international organizations of which the United States is a member including, without limitation, the International Energy Agency;

b.      Restriction or cessation of production of Product(s) due to the imposition of conditions or requirements by any government or any person purporting to act under the color or claim of any governmental authority which makes it necessary to cease or to reduce the production of the Product(s);

c.      Hostilities of war (declared or undeclared), embargoes, blockades, civil unrest, riots, or disorders, terrorism, or sabotage, and other acts of the public enemy;

d.      Fires, explosions, catastrophic weather conditions and other acts of nature;

e.      Disruption or breakdown of production or transportation facilities, as long as not caused by the party claiming Force Majeure;

If the Force Majeure event is forecast to or actually last(s) thirty (30) consecutive days or more, either Party shall have the right to cancel the Agreement by giving written notice.  Seller's ability to supply Products under the Agreement is dependent upon continued availability of necessary raw materials and petroleum products from its usual and anticipated suppliers and continued availability of energy supplies.  If raw materials, Product(s), or energy supplies are not readily available in sufficient quantities or permit Seller to

meet its total commitments for Products, then Seller shall have the right to allocate, in a fair and reasonable manner, among its customers and its own requirements, the Product(s)as are available. In addition, the Seller shall not be obligated to make up deliveries of Product(s) which have been prevented by a Force Majeure event.

Notwithstanding the provisions above, nothing in this Agreement shall relieve the Buyer of the obligation to pay Seller in full the purchase price or any other amounts due for the Product(s) actually delivered or received hereunder.

10.    TAXES.

In those cases in which the laws, regulations or ordinances at the delivery destination impose upon Seller the obligation to report, to collect or to pay such taxes, excises, charges and/or inspection or other fees relating to this transaction, Buyer shall deliver to Seller proper evidence of tax exemption as required or permitted by law to establish exemptions from such taxes and other fees now in effect or hereafter imposed on or with respect to the delivery or products under this transaction. Buyer shall reimburse Seller promptly for all documented amounts remitted on Buyer's behalf or pay to Seller via invoicing or otherwise such amounts equivalent to such governmental exactions for which Seller shall be liable.

11.    LAWS AND ARBITRATION.

This contract shall be governed by and construed in accordance with the laws of the State of New York, USA, and any claim or controversy arising out of, or relating to this contract or breach thereof shall be settled by arbitration, and subject to the rules of the American Arbitration Association, in the City of New York, by a panel of three arbitrators, one chosen by each party and the third nominated by the two arbitrators so chosen. The decision of the three arbitrators, or two of the three arbitrators shall be final and binding on both parties. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.

The arbitrators shall award to the prevailing party, as determined by the arbitrators, all of its costs and fees, administrative fees, travel expenses, out-of-pocket expenses such as copying and telephone, court costs, witness fees and attorneys' fees.

The remedies set forth in this contract are in addition to any and all remedies provided by the Uniform Commercial Code and applicable law.

12.    ASSIGNMENT.

This Agreement shall bind and inure to the respective successor(s), and assigns of the parties hereto, but neither party shall assign, in whole or in part, any of its rights and obligations under this Agreement without the prior written consent of the other party which shall not be unreasonably withheld. No such assignment shall relieve Assignor of the performance of its obligations under the Agreement. Any purported assignment in violation of this provision shall be null and void. Notwithstanding the above, Seller can assign its right to receive payment under this Agreement without the prior written consent of Buyer.

13.    ENVIRONMENTAL AND REGULATORY COMPLIANCE.

Seller and Buyer warrant that they have complied and will continue to comply with all applicable U.S. Federal, state or local environmental including EPA laws and regulations.

14.    SAFETY REGULATIONS.

Each party agrees that its agents, representatives, and employees will comply with all applicable safety regulations of the other's facilities when such agents, representatives, or employees are upon the facilities

when such agents, representatives, or employees are upon the facilities of the other in connection with the performance of this Agreement.

15.    SELLER/BUYER RELATIONSHIP.

It is agreed that neither the entry into this Agreement nor the purchase and receipt of Product(s) hereunder by the Buyer or the sale and delivery of Product(s) hereunder by the Seller shall be deemed to be an admission by the Buyer or the Seller of a course of dealing between the parties or usage of trading giving rise to, imposing and/or implying any obligation whatever of the Buyer to purchase and receive Product(s) or the Seller to sell and deliver or to continue to sell and deliver Product(s) to the Buyer after the expiration or termination of this Agreement or in the event any federal, state or local regulation, ruling or public law imposes, re-imposes or in any way establishes any form of supplier/ purchaser relationship or obligation relative to the supply and/or purchase of Product(s) by either party hereto. Each party hereby waives and agrees not to exercise any right or obligation it may have under such federal, state or local supplier/purchaser rule or regulation to call on the other party to make available or accept delivery of such Product(s) after the expiration or termination of this Agreement, unless such rule or regulation makes it mandatory for either party to supply or receive Product(s) to or from the other as distinguished from making it mandatory for either party to supply or receive such Product(s) if called upon to do so. It being clearly intended by the parties that, except as otherwise specifically provided in writing, signed by the parties, this Agreement and all other obligations of the Buyer to purchase and receive and the Seller to sell and deliver Product(s) to the Buyer shall cease, terminate and expire upon the expiration or termination of this Agreement in accordance with its terms.

16.    NEW OR CHANGED REGULATIONS.

Seller is entering into this Agreement in reliance on the laws, rules regulations, decrees, impositions, concessions, and other arrangements of all governmental instrumentalities (collectively, "Regulations"), in effect on the date hereof which affect the transaction covered and the product sold hereunder including, without limitation, the production, gathering, manufacture, supply, transportation, and delivery of such Product. In the event that any of the Regulations are changed or new Regulations become effective during the term of this Agreement, and such changed or new Regulation

a.    is not covered by another provision of this Agreement and

b.    adversely affects Seller or Seller's suppliers
Seller shall have the option to increase the price of the product or amend other terms in this Agreement affected by such changed or new Regulation. Seller may exercise such option at any time after such changed or new Regulation is promulgated by notice to Buyer setting forth the new price and/or amended terms and the effective date thereof ("Effective Date"). Within fifteen (15) business days after receipt of Seller's notice, Buyer may declare its intention to terminate this Agreement by notice to Seller. If within fifteen (15) business days of receipt of Buyer's notice of intention to terminate, Seller does not give Buyer notice that Seller waives the new price and/or amended terms, this Agreement shall terminate on the forty-fifth (45th) day following Seller's receipt of Buyer's notice of intention to terminate. In such event, the new price and/or amended terms shall apply to all products delivered on or after the Effective Date.

17.    NON-PERFORMANCE AND LIQUIDATION.

Without limiting any other rights that may be available to the Liquidating Party (as defined below) (whether under any other agreement or terms and conditions, as a matter of law or otherwise), in the event (each a "Default") that a party hereto (the "Defaulting Party")

a.    is the subject of a bankruptcy, insolvency, reorganization or other similar proceeding,

b.    fails to pay its debts generally as they become due or otherwise is bankrupt or insolvent, or

c.      fails to pay or perform any obligation to the other party (the "Liquidating Party") and such failure continues for one (1) New York banking day after written notice from the Liquidating Party, the Liquidating Party shall have the right, exercisable in its sole discretion and at any time or times, to liquidate undelivered, unpaid transaction for Product(s) and/or (at the Liquidating Party's election) any or all other agreements between the parties for the purchase and sale of Product(s) or swaps with respect to the prices thereof or options on any of the foregoing (collectively "Transactions") then outstanding by closing-out this transaction and any other transaction being liquidated (whereupon they shall automatically be terminated, except for the payment obligation referred to below), calculating the loss, if any, for each such transaction, and aggregating or netting such amounts and (at the liquidating party's election) any and all other amount(s) owing under this transaction or any other transaction being liquidated to a single liquidated settlement payment that will be due and payable within one (1) New York banking day after the liquidation is completed. "Loss" in respect of each transaction shall be the loss (or gain) to the Liquidating Party as a result of the liquidation of that transaction (or other consequential damages), including, without limitation, the cost of entering into a replacement transaction and of maintaining, terminating and/or reestablishing any hedge or related trading positions (and discounted to present value or nearing interest, as appropriate), in each case, as determined by the liquidating party in any commercially reasonable manner. In addition, after a default, the Liquidating Party (at its election) shall have a general right of setoff with respect to any or all amounts owing between the parties (whether under this transaction, under another transaction or otherwise and whether or not then due), provided that any amounts not then due shall be discounted to present value. After a default, the Defaulting Party is also responsible for any other costs and expenses (including, without limitation, reasonable attorney's fees and disbursements) incurred by the Liquidating Party in connection with such default.

18.     IMBALANCES.

Where the Agreement is an exchange and unless the parties agree otherwise, if it becomes necessary upon its termination to bring the exchange into balance because of under-delivery or over-delivery of Product(s) by one party to the other party, this Agreement shall be brought into balance during the month following termination by the under-delivering party delivering the amount necessary to balance said exchange or by remitting cash payments at the then current market price.

19.     SANCTIONS.

Buyer covenants and warrants that the Product will not be sold to or traded with, directly or indirectly, any person, entity, agency or nation in violation of any applicable law, regulation or directive of the United States or any international organization.

20.     BUSINESS PRACTICES.

a.      Each party hereto agrees to comply with all the laws and lawful regulations applicable to any activities carried out in the name of or on behalf of the other party under the provisions of this Agreement and/or any amendments to it.

b.      Each party hereto agrees that all financial settlements, billings, and reports rendered to the other party as provided for in this Agreement and/or any amendments to it will, to the best of its knowledge and belief, reflect properly the facts about all activities and transactions related to this Agreement which data may be relied upon as being complete and accurate in any further recording and reporting made by such other party for whatever purpose.  Each party hereto agrees to notify the other party promptly upon discovery of any instance where the notifying party fails to comply with provision a. above, or where the notifying party believes or has reason to believe data covered by b. above is no longer accurate and complete.

21.     CONFIDENTIALITY.

a.      Parties may disclose to each other from time to time certain business, technical and other information concerning Product(s) which is privileged and confidential or which otherwise constitutes the trade secrets of the parties or which has been designated by the owner of the information as confidential and proprietary (the "Confidential Information"). The parties agree, for a period of two (2) years to hold the Confidential Information in the strictest confidence and to make no use of that information other than in performance of this Agreement.

b.      Each party agrees not to unnecessarily copy, reproduce or duplicate the Confidential Information and, unless otherwise compelled by law, subpoena or process or on the advice of counsel, shall limit the availability of and access to the information within its organization to employees on a need-to-know basis only.

c.      The parties agree to take all necessary precautions to secure and to maintain the confidentiality of Confidential Information and to prevent disclosure to third parties unless the party obtains the other party's written consent to do so.

Each party agrees that, upon expiration or termination of this Agreement, it shall return to the other party all documents or electronic data, including copies thereof, containing Confidential Information.

22.      MERGER.

The Agreement is a complete and exclusive statement of all terms and conditions governing the purchase and sale of Product(s). No prior contract or course of dealing between the parties shall be admissible in construing the terms of the Agreement. Buyer affirms that no representations have been made by Seller or relied on by Buyer in entering into the Agreement. No term or condition contained in any purchase order or other document of Buyer shall constitute part of the Agreement unless specifically agreed to by Seller in writing, whether or not such purchase order or other document is sent by Buyer to Seller in connection with Buyer's acceptance of the Agreement.

23.      NOTICES.

Any notice to be served pursuant to this Agreement shall be sent via certified mail, return receipt requested, or by recognized international carrier with tracking facilities or via facsimile with confirmation of delivery to:

> Glencore Ltd.
> Attention: Treasurer
> Three Stamford Plaza
> 301 Tresser Boulevard
> Stamford, CT  06901-3244
> USA
> Facsimile: (203) 978-2652

24.      NO WAIVER; CUMULATIVE REMEDIES.

Except as specifically provided in the Agreement:

(i) failure or delay on the part of either party in exercising any right, power or remedy hereunder and no course of dealing between Seller and Buyer shall operate as a waiver of any such right, power or remedy;

(ii) no single or partial exercise of any such right, power or remedy shall preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder;

(iii) without prejudice to Article 13, all rights, powers and remedies provided hereunder are (whether or not expressly stated elsewhere in the Agreement with respect to any particular right, power or remedy) cumulative and not exclusive of any other rights, powers or remedies provided by laws or otherwise; and

(iv) no notice or demand by one party in any case shall entitle the other party to any other or future notice or demand in similar or other circumstances or constitute a waiver of the right of the first party to take other or further action in any such circumstance without notice or demand.

25.    SEVERABILITY.

Should any provision of this Agreement be held unenforceable or in conflict with the law of any jurisdiction, then the validity of the remaining provisions shall not be affected by such a holding.

26.    AMENDMENT AND MODIFICATION.

This Agreement may not be modified or amended except by a written instrument executed by the parties.

27.    HEADINGS.

The headings of this Agreement are intended solely for reference and shall not constitute a part hereof or deemed to limit or expand the scope of any provision of this Agreement.

28.    ENTIRE AGREEMENT.

These General Terms and Conditions and the other contract documents including the Sales or Purchase Confirmation are incorporated by reference herewith constitute the parties' entire agreement with respect to the subject matter. Buyer and Seller acknowledge that

a.    no oral understandings form any part of their agreement and

b.    neither of them relied on any factual representations, opinions, or promises expressed by the other as an inducement to enter into this agreement.

- END -



| David Zimmerman/stamford/glen | To | Kevin Mannion/stamford/glen@glencore |
| 11/18/2009 12:10 PM | cc | |
| | bcc | |
| | Subject | GTC's Amendments |

History:   ⤷ This message has been forwarded.

**JULY 2008**

Page 3, Clause 6, section (b)

b.      Buyer to prepay 100 percent contract value (including any tolerance and any applicable taxes) to Seller's designated bank account in immediately available funds without offset, deduction or counterclaim, at latest **twenty four (24) hours** prior to first day of the contractual layday range, ETA of vessel/barge, or book transfer date, whichever is earlier. Settlement of the balance owed (if any, by comparing final amount due from Buyer to Seller with amount prepaid by Buyer to Seller) to be made by the owing party within one (1) New York banking day of receipt of owed party's invoice.

**Deleted: 1 New York Banking Day -** Replaced with **twenty four (24) hours**

**JULY 2009**

12.    ASSIGNMENT.

This Agreement shall bind and inure to the respective successor(s), and assigns of the parties hereto, but neither party shall assign, in whole or in part, any of its rights and obligations under this Agreement without the prior written consent of the other party which shall not be unreasonably withheld. No such assignment shall relieve Assignor of the performance of its obligations under the Agreement. Any purported assignment in violation of this provision shall be null and void. **Notwithstanding the above, Seller can assign its right to receive payment under this Agreement without the prior written consent of Buyer.**

# Exhibit B

WAESCHE, SHEINBAUM & O'REGAN, P.C.

111 BROADWAY
NEW YORK, NY 10006-1991

TELEPHONE:  212-227-3550
FACSIMILE:   212-267-5767
E-MAIL: waesche@waeschelaw.com

JOHN R. KEOUGH, III
RICHARD W. STONE II
JOHN R. FOSTER

CASEY D. BURLAGE

FRANCIS M. O'REGAN
OF COUNSEL

September 19, 2011

**BY EMAIL AND FAX**
John D. Surma, Esq.
Sedgwick LLP
1111 Bagby Street, Suite 2300
Houston, TX 77002-2556

Larry W. Jenkins Jr.
Denenberg Tuffley, PLLC
28411 Northwestern Hwy, Ste. 600
Southfield, MI 48034

Re:    Demand for Arbitration
       Our File: D331

Gentlemen,

We attach Glencore Ltd.'s Demand for Arbitration.  In accordance with the parties' agreement to arbitrate, Glencore is filing the Demand with the American Arbitration Association. Glencore hereby appoints as its arbitrator Donald P. Murnane, Jr., Esq.  Mr. Murnane's address and contact details are:

Donald P. Murnane, Jr., Esq.
Freehill Hogan & Mahar LLP
80 Pine Street
New York, NY 10005-1759
Tel.: 212-425-1900
Fax: 212-425-1901
Email: murnane@freehill.com

Glencore demands that Evonik Carbon Black LLC/Degussa Engineered Carbons, L.P. interests appoint an arbitrator in the matter promptly and proceed with the arbitration pursuant to the parties' agreement.

John D. Surma Esq.
Larry W. Jenkins Jr.
September 19, 2011
Page 2

Very truly yours,

John R. Keough, III

cc: **BY EMAIL**
    Donald P. Murnane, Jr., Esq.



American Arbitration Association
*Dispute Resolution Services Worldwide*

# COMMERCIAL ARBITRATION RULES
## DEMAND FOR ARBITRATION

Please visit our website at www.adr.org if you
would like to file this case online. AAA Case Filing
Services can be reached at 877-495-4185.

*Please see attached Schedule A for Co-Respondent

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| Name of Respondents | | | Name of Representative (if known) | | |
|---|---|---|---|---|---|
| Evonik Carbon Black LLC/Degussa Engineered Carbons, L.P.* | | | John D. Surma, Esq.* | | |
| Address | | | Name of Firm (if applicable) | | |
| 379 Interpace Parkway | | | Sedgwick LLP | | |
| | | | Representative's Address | | |
| | | | 1111 Bagby Street, Ste. 2300 | | |
| City | State | Zip Code | City | State | Zip Code |
| Parsippany | NJ | 07054-0677 | Houston | TX | 77002 |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| 973-541-8000 | | 973-541-8100 | 832-426-7000 | | 832-426-7060 |
| Email Address: | | | Email Address: | | |
| | | | john.surma@sdma.com | | |

The named claimant, a party to an arbitration agreement dated 12/22/09 & 6/28/10 (amended), which provides for arbitration under the

Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE
Claims by Buyer (Evonik/Degussa) against Seller (Glencore) alleging damages from shipments of No. 6 fuel oil delivered by barge to Buyer's facilities in Orange, Texas and Ivanhoe, Louisiana under contracts dated December 22, 2009 and June 28, 2010 (as amended) (including claims alleged in two (2) lawsuits filed in Texas state courts in breach of the contracts). Claimant requests declaratory award denying liability for claims and granting related relief.

| Dollar Amount of Claim $ | Other Relief Sought: ✕ Attorneys Fees    Interest |
|---|---|
| Approx. $250,000 for reimbursement of attorneys' fees and costs (as near as presently estimated) | ✕ Arbitration Costs    Punitive/ Exemplary    Other _____ |

Amount Enclosed $ 2,800    In accordance with Fee Schedule:  ◯ Flexible Fee Schedule    ✕ Standard Fee Schedule

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:

Hearing locale New York City    (check one) ◯ Requested by Claimant    ✕ Locale provision included in the contract

| Estimated time needed for hearings overall: | Type of Business: Claimant Fuel Oil Trader |
|---|---|
| hours or    3    days | Respondent Fuel Oil Buyer/User |

Is this a dispute between a business and a consumer?  Yes ✕ No  Does this dispute arise out of an employment relationship?  Yes ✕ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law.  ◯ Less than $100,000    $100,000 - $250,000    Over $250,000

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| Signature (may be signed by a representative)    Date: 9/19/2011 | Name of Representative John R. Keough, III |
|---|---|
| Name of Claimant Glencore Ltd. | Name of Firm (if applicable) Waesche, Sheinbaum & O'Regan, P.C. |
| Address (to be used in connection with this case) 3 Stamford Plaza, 301 Tresser Blvd. | Representative's Address 111 Broadway, Ste. 401 |
| City Stamford | State CT | Zip Code 06901 | City New York | State NY | Zip Code 10006 |
| Phone No. 212-227-3550 | Fax No. 212-267-5767 | Phone No. 212-227-3550 | Fax No. 212-267-5767 |
| Email Address: j.keough@waeschelaw.com | Email Address: j.keough@waeschelaw.com |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. Send the original Demand to the Respondent.

## Schedule A

| Name of Respondent | | | Name of Representative (if known) | | |
|---|---|---|---|---|---|
| HDI-Gerling America Insurance Company | | | Larry W. Jenkins Jr. | | |
| Address | | | Name of Firm (if applicable) | | |
| 150 N. Wacker Drive | | | Denenberg Tuffley, PLLC | | |
| | | | Representative's Address | | |
| | | | 28411 Northwestern Hwy, Ste. 600 | | |
| City | State | Zip Code | City | State | Zip Code |
| Chicago | IL | 60606 | Southfield | MI | 48034 |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| 312-580-1900 | | 312-580-0700 | 248-549-3900 | | 248-593-5808 |
| Email Address: | | | Email Address: | | |
| | | | jenkins@dt-law.com | | |

meet its total commitments for Products, then Seller shall have the right to allocate, in a fair and reasonable manner, among its customers and its own requirements, the Product(s)as are available. In addition, the Seller shall not be obligated to make up deliveries of Product(s) which have been prevented by a Force Majeure event.

Notwithstanding the provisions above, nothing in this Agreement shall relieve the Buyer of the obligation to pay Seller in full the purchase price or any other amounts due for the Product(s) actually delivered or received hereunder.

10.     TAXES.

In those cases in which the laws, regulations or ordinances at the delivery destination impose upon Seller the obligation to report, to collect or to pay such taxes, excises, charges and/or inspection or other fees relating to this transaction, Buyer shall deliver to Seller proper evidence of tax exemption as required or permitted by law to establish exemptions from such taxes and other fees now in effect or hereafter imposed on or with respect to the delivery or products under this transaction. Buyer shall reimburse Seller promptly for all documented amounts remitted on Buyer's behalf or pay to Seller via invoicing or otherwise such amounts equivalent to such governmental exactions for which Seller shall be liable.

11.     LAWS AND ARBITRATION.

This contract shall be governed by and construed in accordance with the laws of the State of New York, USA, and any claim or controversy arising out of, or relating to this contract or breach thereof shall be settled by arbitration, and subject to the rules of the American Arbitration Association, in the City of New York, by a panel of three arbitrators, one chosen by each party and the third nominated by the two arbitrators so chosen. The decision of the three arbitrators, or two of the three arbitrators shall be final and binding on both parties. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.

The arbitrators shall award to the prevailing party, as determined by the arbitrators, all of its costs and fees, administrative fees, travel expenses, out-of-pocket expenses such as copying and telephone, court costs, witness fees and attorneys' fees.

The remedies set forth in this contract are in addition to any and all remedies provided by the Uniform Commercial Code and applicable law.

12.     ASSIGNMENT.

This Agreement shall bind and inure to the respective successor(s), and assigns of the parties hereto, but neither party shall assign, in whole or in part, any of its rights and obligations under this Agreement without the prior written consent of the other party which shall not be unreasonably withheld. No such assignment shall relieve Assignor of the performance of its obligations under the Agreement. Any purported assignment in violation of this provision shall be null and void. Notwithstanding the above, Seller can assign its right to receive payment under this Agreement without the prior written consent of Buyer.

13.     ENVIRONMENTAL AND REGULATORY COMPLIANCE.

Seller and Buyer warrant that they have complied and will continue to comply with all applicable U.S. Federal, state or local environmental including EPA laws and regulations.

14.     SAFETY REGULATIONS.

Each party agrees that its agents, representatives, and employees will comply with all applicable safety regulations of the other's facilities when such agents, representatives, or employees are upon the facilities

# Exhibit C



ADAMS AND REESE LLP®

**Attorneys at Law**
Alabama
Florida
Louisiana
Mississippi
Tennessee
**Texas**
Washington, DC

Collin G. Warren
Direct: 713.308.0381
E-Fax: 713.308.4090
collin.warren@arlaw.com

September 29, 2011

**Via CMRRR**
John R. Keough, III
WAESCHE, SHEINBAUM & O'REGAN, P.C.
III Broadway
New York, NY 10006-1991

RE:   **CAUSE NO.:   B110128-C;** *Evonik Carbon Black, LLC, f/k/a Degussa Engineered Carbons, L.P., (n/k/a Orion Engineered Carbons, LLP) v. Glencore, Ltd., and Chris Tucker d/b/a Inland Inspections;* in the Civil District Court of Orange County, Texas 163rd Judicial District

Gentlemen:

We write to respectfully decline your recent invitation to arbitrate before the American Arbitration Association.  Specifically, we believe your actions are simply another attempt to avoid the jurisdiction of the district courts of Orange County, Texas as there is no applicable binding arbitration agreement between the parties and you have failed to comply with the procedures set forth in the Texas Civil Practice & Remedies Code.  Furthermore, it seems you voluntarily waived any right (assuming it ever existed) to seek arbitration by substantially invoking the litigation process and taking the extra-ordinary measure of voluntarily submitting your client to the jurisdiction of courts within the State of Texas prior to service of process.

Unless you withdraw your demand to arbitrate, we will take the appropriate steps to protect our client's interests in state court, including seeking the recovery of all associated fees and costs incurred with a meritless demand for arbitration.  A copy of this letter is being sent to the American Arbitration Association as we will not participate in arbitration absent an order from Judge Powell.

Please feel free to call or write if you have any questions.

Best regards,

ADAMS AND REESE LLP

Collin G. Warren

CGW:bt

John R. Keough, III
September 29, 2011
Page 2

_____

cc:   **Via CMRRR**
      Donald P. Murmane, Jr., Esq.
      Freehill Hogan & Mahar LLP
      80 Pine Street
      New York, NY  10005-1759

      **Via CMRRR**
      Larry W. Jenkins Jr.
      Denenberg Tuffley, PLLC
      28411 Northwestern Hwy, Ste. 600
      Southfield, MI 48034

From: Larry Jenkins <LJenkins@dt-law.com>
Subject: **RE: 00076-000022 Evonik Degussa Corp. - Orange/TX CFP10163: Glencore Ltd.'s Demand For Arbitration re Claims by Evonik Carbon Black LLC/Degussa Engineered Carbons, L.P.**
Date: October 6, 2011 5:36:34 PM EDT
To: "'John R. Keough, III'" <j.keough@waeschelaw.com>, "john.surma@arlaw.com" <john.surma@arlaw.com>, "'collin.warren@arlaw.com" <collin.warren@arlaw.com>
Cc: "'schierholzM@adr.org'" <schierholzM@adr.org>, "'kavanaghD@adr.org'" <kavanaghD@adr.org>
▶ 1 Attachment, 16.3 KB

John,

Thank you or your letter requesting arbitration.  Frankly, we have been waiting for Evonik to take a position in this matter, as we believe that our client's claims and Evonik's claims should be resolved in the same forum.  In light of Evonik declining your invitation to arbitrate by way of its letter dated September 29, 2011, HDI also declines to arbitrate this matter.  Therefore, we respectfully request that you remove the matter from the arbitration process you unilaterally initiated.  Thank you.

Regards,

Larry W. Jenkins Jr.
attorney



ATTORNEYS AT LAW
28411 Northwestern Hwy., Suite 600
Southfield, MI 48034
248.549.3900
Fax: 248.593.5808
www.denenbergtuffley.com

Denenberg
Tuffley
PLLC

The contents of this e-mail and any attachments are confidential communications from Denenberg Tuffley, PLLC to the intended recipient(s) only. If you are not an intended recipient, be advised that any disclosure, copying, forwarding, distribution, or use of the contents of this e-mail or its attachments is prohibited. If you have received this e-mail in error, please notify us, destroy any copies that you have made, and delete same from your system.

---

**From:** John R. Keough, III [mailto:j.keough@waeschelaw.com]
**Sent:** Monday, September 19, 2011 7:54 PM
**To:** John D. Surma; Larry Jenkins
**Cc:** Donald Murnane; Casey Burlage
**Subject:** 00076-000022 Evonik Degussa Corp. - Orange/TX CFP10163: Glencore Ltd.'s Demand For Arbitration re Claims by Evonik Carbon Black LLC/Degussa Engineered Carbons, L.P.

Gentlemen,

Please see attached letter and Glencore Ltd.'s demand for arbitration.

Regards,
John

John R. Keough, III
**Waesche, Sheinbaum & O'Regan, P.C.**
111 Broadway
4th Floor
New York, NY 10006
Tel:  212.227.3550
Fax: 212.267.5767
Email:  j.keough@waeschelaw.com

# Exhibit D

# ADAMS AND REESE LLP

## FACSIMILE TRANSMITTAL

**One Houston Center**
1221 McKinney, Suite 4400
Houston, TX 77010
Facsimile (713) 652-5152

| Recipient | Recipient Facsimile | Recipient Phone No |
|---|---|---|
| Walter J. Gallant | 713-599-1355 | |
| John R. Keough, III | 212-267-5767 | |
| Robert C. Oliver | 713-864-2228 | |
| R.M. Sharpe, Jr. | 713-864-2228 | |
| William S. Jackson | 713-464-9467 | |

**DATE**  10/6/2011

**From**

Collin G. Warren

**RE**

**CAUSE NO.: B110128-C;** *Evonik v.*
*Glencore, Ltd., and Chris Tucker d/b/a*
*Inland Inspections*

**No. Pages
Transmitted**

**MESSAGE**

Please see the attached.

### TRANSMITTAL INFORMATION

User #   1714

Adams & Reese
File Number

If you did not receive the number of accompanying pages indicated, or experience any other transmission problems, please contact
**Barbara Trammell** at   713/652-5151

### CONFIDENTIALITY NOTICE

THE ACCOMPANYING FACSIMILE IS INTENDED SOLELY FOR THE USE OF THE RECIPIENT DESIGNATED ABOVE.
DOCUMENT(S) TRANSMITTED HERE WITH MAY CONTAIN INFORMATION WHICH IS CONFIDENTIAL AND PRIVILEGED.
DELIVERY, DISTRIBUTION OR DISSEMINATION OF THIS COMMUNICATION OTHER THAN TO THE INTENDED RECIPIENT
IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY
TELEPHONE.

Form FS 1.1
10/7/2011



# ADAMS AND REESE LLP ®

October 7, 2011

**Via CMRRR**
Vickie Edgerly, District Clerk
801 W Division Ave
Orange, Tx 77630-6353

> RE:   **CAUSE NO.: B110128-C**; *Evonik Carbon Black, LLC, f/k/a Degussa Engineered Carbons, L.P., (n/k/a Orion Engineered Carbons, LLP) v. Glencore, Ltd., and Chris Tucker d/b/a Inland Inspections*; in the Civil District Court of Orange County, Texas 163rd Judicial District

Dear Ms. Edgerly:

Enclosed for filing is the following document:

1.     Plaintiff's Motion to Set Scheduling Conference; and

2.     proposed Order.

Please file stamp the enclosed copies and return them to our office via the enclosed self-addressed stamped envelope. By copy of this letter I am notifying all counsel of record of this filing and forwarding copies of same.

Thank you for your assistance.

Sincerely,

**ADAMS AND REESE LLP**

Barbara Trammell
*Legal Administrative Assistant
to Collin G. Warren*

:bt
Enclosure

cc:    **Via Facsimile:  713-599-1355**
       Walter J. Gallant
       White Mackillop & Gallant P.C.
       2200 West Loop South, Suite 1000
       Houston, Texas 77027

Vickie Edgerly, District Clerk
October 7, 2011
Page 2

cc:    **Via Facsimile:  (212) 267-5767**
       John R. Keough, III
       WAESCHE, SHEINBAUM & O'REGAN, P.C.
       111 Broadway, 4th Floor
       New York, NY 10006-1991

cc:    **Via Facsimile:  (713) 864-2228**
       Robert C. Oliver
       R. M. Sharpe, Jr.
       Sharpe & Oliver, L.L.P.
       550 Westcott, Suite 230
       Houston, Texas 77007-5096

cc:    **Facsimile: (713) 464-9467**
       William S. Jackson
       Cooper, Jackson & Boanerges, P.C.
       9432 Katy Freeway, Suite 100
       Houston, Texas. 77055-6367

CAUSE NO.: B110128-C

| | | |
|---|---|---|
| ORION ENGINEERED CARBONS LLC | § | IN THE CIVIL DISTRICT COURT |
| f/k/a EVONIK CARBON BLACK, LLC and | § | |
| DEGUSSA ENGINEERED CARBONS, L.P., | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| vs. | § | OF ORANGE COUNTY, TEXAS |
| | § | |
| GLENCORE, LTD., and CHRIS TUCKER | § | |
| individually and d/b/a INLAND | § | |
| INLAND INSPECTIONS, LLC | § | |
| Defendants. | § | 163RD JUDICIAL DISTRICT |

## PLAINTIFF'S MOTION TO SET SCHEDULING CONFERENCE

### TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Plaintiff, ORION ENGINEERED CARBONS LLC f/k/a EVONIK CARBON

BLACK, LLC and DEGUSSA ENGINEERED CARBONS, L.P. and pursuant to Orange County Local

Rule 3.23 respectfully files this Motion to Set Scheduling Conference and shows unto the Court

the following:

1.    Plaintiff owns and operates certain chemical plants in Orange County, Texas and St.

Mary's Parish, Louisiana where carbon black is made.  In February, March and September of

2010, Defendants sold, tested, and/or delivered feedstock oil (used to make the carbon black) to

Plaintiff in Orange County, Texas and St. Mary's Parish Louisiana.  Despite being supplied with

Plaintiff's specifications for the feedstock oil, Defendants supplied oil that did not meet

Plaintiff's specifications and that was not suitable for use in Plaintiff's operations.  In short,

Plaintiff was sold bad feedstock oil and Plaintiff unknowingly used the bad feedstock oil in its

equipment and processes.  As a result of the bad feedstock oil being run through Plaintiff's

equipment, significant damage occurred (over $3,000,000.00).  Thereafter, Defendants were

made aware of the issues and damages by Plaintiff and demand was made for a commercial

resolution by Plaintiff. The offer of a commercial resolution was rejected by Defendants and this suit became necessary.

2.      Shortly after filing this lawsuit, and before service of process, this case was removed to the United States District Court for the Eastern District of Texas – Beaumont Division. After much briefing and argument before the Court, the Honorable Judge Ron Clark remanded this case for all purposes back to this Court. During this process, it became clear Defendants would pursue every avenue to avoid litigating this case in Orange County, Texas.

3.      Accordingly, as Defendants attempt to remove this case failed, they now seek to avoid this Court through arbitration. Specifically, Defendants are now attempting to start the process of arbitration under the AAA, despite the fact that Plaintiff never entered into a valid arbitration agreement with Defendants (and Plaintiff has never consented to arbitration with the AAA). Furthermore, Defendants have yet to file a motion to abate this case or even a motion to compel arbitration setting the slate for a dual track of litigation and arbitration. Indeed, Defendants are trying to remove the decision as to whether a valid arbitration agreement exists from this Court's purview.

4.      As the AAA has set an administrative conference call for October 18, 2011, Plaintiff will soon be faced with the time and expense of filing unnecessary answers and motions concerning jurisdiction, making the requested scheduling conference necessary. Specifically, as Defendants have not followed the procedures set forth in Texas law concerning compelling arbitration, the parties – and this Court – are now faced with the potential of a duel between litigation (that is already underway) and an improperly and unilaterally initiated arbitration proceeding. Therefore, in order to minimize the barrage of motions that will likely be filed, and the corresponding waste of judicial economy and the parties' money, an immediate scheduling conference is necessary.

2

5.      Plaintiffs further seek an order of this Court abating the arbitration proceeding.

WHEREFORE, in light of the foregoing, Plaintiff prays that this Court grant its request for a Scheduling Conference and that an Order be entered abating the above arbitration proceeding.

Respectfully submitted,

ADAMS AND REESE LLP

John D. Surma
State Bar No.: 24033666
Collin G. Warren
State Bar No.: 24033439
One Houston Center
1221 McKinney, Suite 4400
Houston, Texas 77010
Telephone:     (713) 652-5151
Facsimile:      (713) 652-5152

**ATTORNEYS FOR PLAINTIFF,
ORION ENGINEERED CARBONS LLC
f/k/a EVONIK CARBON BLACK, LLC
f/k/a DEGUSSA ENGINEERED CARBON, L.P.**

## CERTIFIACATE OF SERVICE

This certifies that a copy of the foregoing motion was served on all counsel of record by means authorized by the TEXAS RULES OF CIVIL PROCEDURE on this the 7th day of October, 2011.

John D. Surma/Collin G. Warren

3

1101321_1.DOC

CAUSE NO.: B110128-C

| | | |
|---|---|---|
| ORION ENGINEERED CARBONS LLC | § | IN THE CIVIL DISTRICT COURT |
| f/k/a EVONIK CARBON BLACK, LLC and | § | |
| DEGUSSA ENGINEERED CARBONS, L.P., | § | |
|     Plaintiff, | § | |
| | § | |
| | § | OF ORANGE COUNTY, TEXAS |
| vs. | § | |
| | § | |
| GLENCORE, LTD., and CHRIS TUCKER | § | |
| individually and d/b/a INLAND | § | |
| INLAND INSPECTIONS, LLC | § | |
|     Defendants. | § | 163RD JUDICIAL DISTRICT |

## ORDER

On this day came on to be considered Plaintiff's Motion to Set Scheduling Conference. After considering said motion, the Court is of the opinion that is should be in all things **GRANTED:**

It is therefore **ORDERED** that a Scheduling Conference shall be held on _____, 2011 at _____ a.m./p.m. Counsel for the parties are required to attend in person.

It is further **ORDERED** that the pending arbitration proceeding between the parties shall be in all things abated.

SIGNED THIS THE ____ DAY OF _____, 2011

_____
JUDGE PRESIDING

4

1101321_1.DOC

<u>AFFIDAVIT</u>

State of New York    )
                    :  ss.:
County of New York )

John R. Keough, III, being duly sworn deposes and says:

1.     I am a member of the firm of Waesche, Sheinbaum & O'Regan, P.C., attorneys for petitioner Glencore Ltd. ("Glencore").

2.     I have read the foregoing Petition to Compel Arbitration and know the contents thereof and the same are true to the best of my knowledge, except as to those matters alleged on information and belief and, as to those matters, I believe them to be true.

3.     The sources of my information and the grounds for my belief are personal knowledge as well as an examination of documents and information maintained by Glencore.

_____
JOHN R. KEOUGH, III

Sworn to before me this

11TH day of October, 2011.

_____
Notary Public

CASEY BURLAGE
Notary Public, State of New York
No. 02BU6217606
Qualified in New York County
Commission Expires February 8, 2014