UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                              :
GLENCORE LTD.,                                                :
                                        Petitioner,           :
                    -v-                                       :        11 Civ. 7153 (PAE)
                                                              :
DEGUSSA ENGINEERED CARBONS L.P., a/k/a Evonik :                        OPINION & ORDER
Carbon Black L.L.C., and HDI-GERLING AMERICA      :
INSURANCE COMPANY,                                            :
                                        Respondents.          :
                                                              :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        This decision resolves a motion to compel arbitration.  The Court holds that the dispute

between Petitioner Glencore Ltd. ("Glencore") and Respondent Degussa Engineered Carbons

L.P. a/k/a Evonik Carbon Black L.L.C. ("Evonik"), and Evonik's insurer, HDI-Gerling America

Insurance Co. ("HDI"), is subject to a binding arbitration provision enforceable under the

standards set out in Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201–208.  The Court

further holds that it has personal jurisdiction over Evonik.  The Court therefore grants Glencore's

petition to compel arbitration.

**I.  Background**[1]

    **A.  Evonik's Claims Against Glencore**

        Evonik owns and operates chemical plants in Orange, Texas, and Ivanhoe, Louisiana,

where carbon black is made.  On various occasions during the first three quarters of 2010,

Glencore delivered, by barge, No. 6 feedstock oil to an Evonik plant.  Evonik paid for those

---

[1]  Unless otherwise noted, the Court's account of the facts of this case is drawn from the parties'
pleadings and the facts to which they have stipulated.

shipments of oil.  These fuel deliveries and payments were made pursuant to quarterly

agreements between representatives of Glencore and Evonik, governing such terms as the

quantity, quality, delivery site, and test specifications of the oil.  The parties' extensive written

communications with each other (all by email) that bear on these agreements are chronicled, as

relevant, later in this opinion.

On March 28, 2011, Evonik sued Glencore in the 163rd Judicial District Court of Orange

County, Texas.  Evonik asserted claims as to four of these shipments – three during the first

quarter of 2010 and one during the third.[2]  Evonik claimed that the oil shipped by Glencore did

not meet the specifications to which the parties had agreed.  Evonik further claimed that this

caused more than $3 million worth of damage to its equipment.  The same day, Evonik's insurer,

HDI, filed a suit against Glencore in the same court, making nearly identical claims.  Evonik and

HDI's claims are for breach of warranty, fraud, negligent misrepresentation, and product

liability.

On March 30, 2011, and April 1, 2011, Glencore removed the two actions to United

States District Court in the Eastern District of Texas.  On April 29, 2011, Evonik and HDI

moved to remand the actions to Texas state court.  By orders dated June 13, 2011, and August 2,

2011, the district court remanded the actions to Texas state court.  On August 18, 2011, Glencore

filed answers to the two petitions.

On September 19, 2011, Glencore made a written demand for arbitration upon Evonik

and HDI.  To this demand, Glencore attached the portion of its "General Terms and Conditions"

("GTCs") requiring that any claims arising out of, or relating to, the parties' contracts be settled

---

[2]  The deliveries in question were made on February 16, 2010 (to the Orange plant); in March
2010 (same); on March 9, 2010 (to the Ivanhoe plant); and on September 22, 2010 (same).

by arbitration.  Glencore asserted that the GTCs bound Evonik, because the GTCs had been expressly incorporated by reference in the parties' various written contracts pursuant to which Glencore had made the feedstock oil deliveries in dispute.

The relevant excerpt of Glencore's GTCs, contained in Paragraph 11, provides:

11.    LAWS AND ARBITRATION

This contract shall be governed by and construed in accordance with the laws of the State of New York, USA, and any claim or controversy arising out of, or relating to this contract or breach thereof shall be settled by arbitration, and subject to the rules of the American Arbitration Association ["AAA"], in the City of New York, by a panel of three arbitrators, one chosen by each party and the third nominated by the two arbitrators so chosen.  The decision of the three arbitrators, or two of the three arbitrators[,] shall be final and binding on both parties.  Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.

The arbitrators shall award to the prevailing party, as determined by the arbitrators, all of its costs and fees, administrative fees, travel expenses, out of pocket expenses such as copying and telephone, court costs, witness fees and attorneys fees.

The remedies set forth in this contract are in addition to any and all remedies provided by the Uniform Commercial Code and applicable law.

Also on September 19, 2011, Glencore filed a demand with the AAA, asking AAA to initiate administration of the arbitration.  Glencore sought declaratory relief that it was not liable for the claims Evonik and HDI had brought.  Glencore also sought reimbursement for attorneys' fees and related costs in the Texas litigation.

On September 29, 2011, Evonik, through counsel, declined Glencore's "recent invitation to arbitrate."  Evonik denied that there was a binding arbitration agreement between the parties.  On October 6, 2011, HDI told Glencore that it, too, declined arbitration.  HDI explained that it believed "that [HDI's] claims and Evonik's claims should be resolved in the same forum."

### B. Glencore's Petition to Compel Arbitration

On October 11, 2011, Glencore filed a petition in this Court to compel arbitration, in New York City, in accordance with the GTCs.  Glencore asserted that the GTCs, including the arbitral provision, had been incorporated into its written sales contracts with Evonik, including the two contracts pursuant to which the fuel shipments in dispute had been made.  These were (1) a sales contract dated December 22, 2009 (as later amended), which Glencore asserted governed the first quarter shipments; and (2) a separate sales contract dated July 2, 2010 (with an amendment also dated July 2, 2010), which Glencore asserted governed the third-quarter shipments.

On November 2, 2011, Evonik filed a motion to dismiss the petition.  Evonik disputed that it was bound by the GTCs.  It argued, in essence, that its agreement with Glencore had been complete before Glencore furnished it with the GTCs, and that it had not explicitly or implicitly adopted them.  Under these circumstances, Evonik argued, any term within the GTCs could become part of the parties' contract under the Uniform Commercial Code ("U.C.C.") only if that term or condition did not "materially alter" the contract.  *See* Resp't's Mem. of Law 8, Nov. 1, 2011 (Dkt. 16) (citing TEX. BUS. & COM. CODE § 2.207(b)(2) (West 2011)).  Evonik argued that the mandatory arbitration provision in Paragraph 11 of the GTCs is a material alteration.  Evonik also claimed that the Court lacked personal jurisdiction over it.

On November 2, 2011, the Court held an initial conference.  After extended colloquy about the contracting process between the parties, the Court directed the parties to submit various materials to assist it in resolving expeditiously whether Evonik (and derivatively HDI)[3] was bound by the arbitration provision. These were:  (1) all documents, arranged chronologically,

---

[3]  At the conference, HDI acknowledged that if Evonik is bound by the arbitration provision, it (as HDI's insurer and assignee) is also bound.  Accordingly, the ensuing analysis in this opinion as to Evonik's obligations with respect to arbitration applies equally to HDI.

which either party deemed relevant to that issue; (2) a list of all facts deemed relevant by either party to whose accuracy the parties were prepared to stipulate; and (3) for each party, a list of the facts, if any, that it deemed relevant but to which its adversary could not stipulate. *See* Conf. Tr., Nov. 2, 2011, 45–53 (Dkt. 27); Order, Nov. 22, 2011 (Dkt. 33).

The Court also directed the parties to submit memoranda of law addressing whether the documentary record and stipulated facts demonstrated a binding agreement to arbitrate. The Court advised that it would determine whether summary judgment could be granted on the basis of these submissions. If not, a jury trial would be held. *See* Order, Nov. 3, 2011 (Dkt. 22).

On December 9, 2011, the parties' helpful submissions, pursuant to these orders, were fully submitted.[4]

### C.  Agreements and Communications Between Glencore and Evonik

The events and communications between the parties surrounding Glencore's shipment of oil to Evonik during the first three quarters of 2010 – as revealed by the parties' submissions – were as follows.

#### 1.  Shipments for the first quarter of 2010

On November 30, 2009, Brian Saucier, Evonik's Vice President of Energy Management / NAFTA Inorganic Materials, emailed D. Coleman Conkling of Glencore. Saucier's email noted that Evonik's Ivanhoe, Louisiana and Orange, Texas, quarterly contract for the supply of carbon black feedstock oil was coming to an end. It invited Glencore to bid for that business for the first quarter of 2010. Saucier's email attached detailed test and property specifications for the oil, and

---

[4]  The Court has been advised by the parties that the 163rd Judicial District Court of Orange County, Texas, in which Evonik's lawsuit was filed, voluntarily stayed proceedings in that case, pending the outcome of Glencore's motion to compel arbitration here. The Court expresses its appreciation to its colleague in Texas for doing so.

asked that any bids be submitted by December 4, 2009.  Saucier was responsible for purchasing such oil for Evonik.  *See* Ex. 1; Joint Statement of Facts ¶¶ 12–13 ("JS").[5]

On December 4, 2009, Conkling sent an email response to Saucier.  Conkling offered to supply "CBFS" (carbon black feedstock oil) to Evonik at a stated price for each plant.  *See* Ex. 2; JS ¶ 15.

On December 15, 2009, Saucier emailed Conkling, stating:  "Coleman, After reviewing all offers and group discussions, we are pleased to award you supply deal for the 1st Q 2010. Look forward to continuing our business.  Please have contract prepared accordingly."  Ex. 3; JS ¶¶ 16–17.

On December 23, 2009, Glencore's Samantha O'Connell sent an email to Saucier attaching a document identified as Glencore's sales contract.  The sales contract was dated December 22, 2009 ("the December 22 sales contract").  *See* Ex. 4; JS ¶¶ 18–21.  The preamble to the December 22 sales contract states:  "This sales contract confirms the agreement negotiated on Dec 17, 2009 between Evonik Degussa GmbH and Glencore Ltd regarding the sale of No. 6 Fuel Oil on the following terms and conditions."  The preamble then sets out a contract number (2103063/62/61/59/58) and separate paragraphs identifying the buyer, seller, product, and quantity to be provided to the Orange, Texas and Ivanhoe, Louisiana plants.  The ensuing paragraphs set out specifications as to quality (¶ 5), price (consistent with the earlier email exchange between Conkling and Saucier, ¶ 6), delivery (¶ 7), title and risk of loss (¶ 8), payment (¶ 9), and taxes (¶ 10).  *See id.* ¶¶ 5–10.

---

[5]  "Ex." refers to exhibits that appear in the binder of exhibits jointly prepared by the parties. "JS" refers to the facts to which the parties have jointly stipulated.  "GAF" refers to facts alleged by Glencore but disputed by Evonik; "EAF" refers to facts alleged by Evonik but disputed by Glencore.

Paragraph 11 to the December 22 sales contract, entitled, "all other terms," states:

> As Glencore is the selling party in this transaction, and as per standard industry practice, Glencore's contract along with Glencore Ltd's general terms and conditions dated October 2005 with amendments made in July 2008 and July 2009 shall govern the terms of this transaction. If any of the above is contrary to your understanding of our agreement, please respond immediately by fax with your specific points of disagreement (not a full contract) to seller's fax number indicated on this contract. Glencore Ltd. will not accept any notices sent to any other number and will not be responsible for any costs or liabilities resulting therefrom. In the event no such notification is received by the close of business on the next working day following the date of this contract, the provisions set forth in Glencore's contract shall be binding upon both parties without further modification or substitution.

*Id.* ¶ 11.

The December 22 sales contract attached separate specifications for the Ivanhoe, Louisiana, and Orange, Texas facilities. These matched the specifications that Saucier had supplied. Glencore did not attach a copy of its GTCs, to which paragraph 11 had referred.

On January 5, 2010, Saucier responded by email to O'Connell's December 23, 2009 email attaching the December 22 sales contract. He wrote: "We are still Degussa Engineered Carbons, LP . . . Can you change that so I can get PCG [parent company guarantee] in place?" Saucier did not otherwise note any changes to be made to – or points of disagreements with – the December 22 sales contract. *See* Ex. 4; JS ¶ 22.

Later on January 5, 2010, Crystal Kora of Glencore sent an email to Saucier, attaching an amended sales contract. The amended contract was identical to the December 22 sales contract, save that it changed the buyer's name on the contract (in ¶ 1) from "Evonik Degussa GmbH" to "Degussa Engineered Carbons, LP," as Saucier had requested. Ex. 5; JS ¶ 23.

On January 11, 2010, another Glencore employee, Vincent Ciardello, emailed Saucier, inquiring as to "the status of the pending PCG" and noting that the parent company's guarantee "needs to be in place before 1/13/10." Ex. 6; JS ¶ 24.

7

On January 12, 2010, following an exchange of emails (Exs. 7–8; JS ¶ 25), Evonik Industries AG, the German parent of Evonik ("the parent company"), sent an email to Glencore containing the parent company guarantee ("PCG"), dated as of January 1, 2010.  The PCG referenced Glencore's December 22 sales contract (including by its contract number), repeatedly referred to that contract as "the AGREEMENT," and acknowledged that Glencore would deliver No. 6 fuel oil to its subsidiary during the first quarter pursuant to that agreement.  In the PCG, Evonik Industries AG unconditionally guaranteed prompt payment to Glencore and stated that the guarantee would remain in force until April 15, 2009.  The PCG also acknowledged that "CREDITOR [Glencore] and PURCHASER [Degussa Engineered Carbons] may mutually modify the AGREEMENT, and GUARANTOR [the parent company] acknowledges that such modification will not impair or affect GUARANTOR's obligation under this guaranty."  Ex. 8; JS ¶¶ 26–27.

On January 21, 2010, Glencore's Kora sent an email to Saucier attaching an amended sales contract.  The amended contract modified the document's price section.  All other terms remained the same.  Ex. 9; JS ¶¶ 28–30.

On January 21, 2010, Evonik's Saucier responded by email to Kora.  He asked: "Can you also send me copy of terms and conditions?"  Ex. 10; JS ¶ 10.

Also on January 21, 2010, approximately five minutes after Saucier sent his email, Kora responded by email to Saucier, attaching Glencore's current GTCs.  She stated: "Below is a copy of our most current GTCs.  Thank you."  Ex. 10; JS ¶¶ 31–32.

Glencore's GTCs are an 11-page single-spaced document.  Separate sections address such subjects as title and risk of loss, warranty, limitation of loss, payment, credit, marine provisions, security, force majeure, taxes, assignment, environmental and regulatory compliance,

safety regulations, the effect, new and changed (legal) regulations, non-performance and liquidation, and confidentiality. *See* Ex. 10. The preface to the GTCs states that they are applicable to all contracts for Glencore products, including "crude oil, refinery feedstock, [and] refinery and refined petroleum products." *Id.* ¶ 1. The concluding section of the GTCs states that the GTCs and the other contract documents "constitute the parties' entire agreement with respect to the subject matter" and that there are "no oral understandings" between the parties. *Id.* ¶ 28. Paragraph 11 of the GTCs ("LAWS AND ARBITRATION"), providing that any claim or controversy arising out of the contract will be settled by arbitration and will be governed by New York law, is excerpted in full above.

The parties have stipulated that Saucier received Kora's email attaching Glencore's GTCs, and that Saucier did not object to the GTCs or any terms therein. JS ¶ 33.

Between February 16 and March 9, 2010, Glencore delivered shipments of No. 6 fuel oil to Evonik on at least three occasions: on February 16, 2010 (to the Orange, Texas plant); in March 2010 (to the same plant); and on March 9, 2010 (to the Ivanhoe, Louisiana plant). JS ¶¶ 36, 38–39. Each of these three first-quarter shipments is a subject of the pending lawsuit.

### 2. Shipments for the second quarter of 2010

On March 9, 2010, Evonik's Saucier emailed Glencore's Conkling. Saucier noted that the "[Ivanhoe] and [Orange] quarterly contract is coming to an end" and stated that he "wanted to extend an invitation for you to bid on the business for 2Q 2010." Ex. 11; JS ¶ 41. Saucier's email attached the specifications for the Orange, Texas, and Ivanhoe, Louisiana plants.

On March 12, 2010, in an email response to Saucier, Conkling stated, on behalf of Glencore: "We would like to continue our relationship as the CBFS supplier for your Orange, Texas, and Ivanhoe, Louisiana plants for the 2d quarter of 2010." Conklin specified prices for

supplying each plant.  Conkling added:  "All other provisions will be the same. . . . I look forward to hearing from you."  Ex. 12; JS ¶ 42.

On March 24, 2010, Glencore's Kora emailed Saucier attaching a document identified as Glencore's sales contract for the shipments to the Ivanhoe plant.  It was dated March 23, 2010, and paralleled the earlier sales contract.  The preface to the March 23 sales contract stated that it "confirms the agreement negotiated on March 22, 2010 between Degussa Engineered Carbons, LP and Glencore Ltd regarding the sale of No. 6 Fuel Oil on the following terms and conditions."[6]  The sales contract recited quantity and price for the fuel oil for Ivanhoe that matched the amounts set forth in Saucier's and Conkling's emails. Like the identically worded paragraph in the December 23, 2010 agreement, ¶ 11 of the March 23, 2010 sales contract ("All Other Terms") stated that Glencore's GTCs "shall govern the terms of this transaction," that Evonik was obliged to send immediate notice to Glencore if it disagreed with any part of the sales contract, and that to the extent Evonik did not furnish such notice, "the provisions set forth in Glencore's contract shall be binding upon both parties."  Ex. 13; JS ¶ 43.

On March 24, 2010, approximately 90 minutes after Kora's email, Saucier replied to her by email.  Saucier's email referenced in the subject line the same Glencore contract numbers that appeared in Kora's email.  It read: "Thanks…Got a couple of revisions…On quality, please add in as we have in the past the quality per my specs, I think attachments a&b historically.  Also

---

[6]  It is unclear to what Kora was referring in adverting to "an agreement negotiated March 22." Despite being directed to proffer all facts either party deemed relevant, neither party has indicated that any relevant communication between the parties occurred that day.  It is possible that Kora meant to write, but mistyped, "March 12" (the date of Conklin's email responding to Saucier's request for a bid).  It is also possible that on March 22, Evonik (in some fashion that the parties have been unable to reconstruct) communicated acceptance of Glencore's offer as to the Ivanhoe plant.  In any event, because the second quarter shipments are not at issue, this factual mystery does not appear relevant to the current dispute.

need to add in language abo[ut] a 'true up' at month's end." Ex. 13; JS ¶ 44.  Saucier did not

indicate any other point of disagreement with the March 23, 2010 sales contract.

On March 25, 2010, Kora sent an email to Saucier attaching an amended sales contract.

The amended sales contract made the changes that Saucier had requested to the quality section,

but was otherwise unchanged.  Ex. 14; JS ¶ 45.

The parties have stipulated that Saucier received Kora's email and the attached amended

sales contract, and that he did not object to the contract or any of the terms therein.  JS ¶ 46.  The

parties have further stipulated that Glencore sold and delivered shipments of oil to Evonik during

the second quarter of 2010 and was paid for that oil.  There is no dispute between the parties as

to those sales and shipments of oil.  JS ¶¶ 47–48.

### 3.   Shipments for the third quarter of 2010

On June 4, 2010, Glencore's Conkling again emailed Saucier.  He stated: "We would like

to continue our relationship as the CBFS supplier for your Ivanhoe, La., plant for the 3rd quarter

of 2010";  set out Glencore's price quote; and added:  "I look forward to hearing from you."  Ex.

15; JS ¶ 49.

On June 21, 2010, Saucier responded to Conklin by email.  He stated that Evonik "is

extremely pleased to award you term supply deal to our DEC-Ivanhoe facility.  Please send out

contracts as soon as you can."  Ex. 16; JS ¶¶ 50–51.

On June 29, 2010, Meagan Phillips of Glencore emailed Saucier, attaching a contract

described as Glencore's sales contract dated June 28, 2010, for the third quarter shipment to the

Ivanhoe plant.  The June 28, 2010 sales contract paralleled the sales contracts for the two earlier

quarters, and contained an identical ¶ 11.  Phillips' cover email to Saucier, entitled "3rd Qtr

Contract," stated:  "Hi Brian[:]  Attached below is the contract you requested.  Please let me know if I can help with anything else."  Ex. 17; JS ¶ 52.

On June 29, 2010, six minutes after Phillips sent her email, Saucier responded by email, stating:  "thanks…can we add back in the quality section, conforming to attachment A[.]"  Ex. 17; JS ¶ 54.  Saucier did not indicate any other point of disagreement with the March 23, 2010 sales contract.

On June 29, 2010, approximately one hour later, Phillips responded to Saucier by email, stating: "Hi Brian, We'll get the contract revised and sent back to you asap."  Ex. 17; JS ¶ 55.

Later on June 29, 2010, Glencore's Kora sent an email to Saucier attaching a document described as Glencore's sales contract dated June 28, 2010, related to the third quarter shipments to Ivanhoe.  That sales contract was the same as the one Phillips had sent the previous day.  Ex. 18; JS ¶ 56.

On July 2, 2010, Saucier responded by email to Kora, stating (again):  "can you please change Quality to be conforming with attachment A."  Ex. 19; JS ¶ 57.

Later on July 2, 2010, Kora sent an email to Saucier, attaching a document identified as Glencore's amended sales contract dated July 2, 2010, relating to third quarter shipments to the Ivanhoe plant.  The amended contract changed the quality section as Saucier had asked; all other terms remained the same.  Ex. 20; JS ¶ 58.  The parties have stipulated that Saucier received the emails attaching the June 28, 2010 sales contract and the July 2, 2010, sales contract and (except as noted above with respect to the quality section in the June 28, 2010 document) did not object to the sales contract's terms.  JS ¶ 59.

On August 3, 2010, Evonik's CBO operations manager, Jennifer Anderson, sent an email to Glencore's Jeffrey Henderson, stating: "Good morning, Jeff, Brian [Saucier] didn't give me a

copy of the 3rd quarter contract for [Ivanhoe].  Would you mind emailing it over to me?"  Ex. 21; JS ¶ 60.  The following day, Glencore's Phillips emailed to Anderson the penultimate draft of the sales contract for the third quarter for Ivanhoe.  Ex. 21; JS ¶ 61.  The parties have stipulated that, like Saucier, Anderson, having received this contract, did not object to its terms.

During the third quarter, Glencore sold and delivered shipments of oil to Evonik and received payments for that oil.  JS ¶ 63.  These included a shipment (made on September 22, 2010) as to which Evonik has made claims.  JS ¶ 67.[7]

## II. Discussion

The issue before the Court is solely whether Glencore and Evonik entered into a binding agreement, as provided in ¶ 11 of Glencore's GTCs, to arbitrate their disputes relating to the delivery of No. 6 feedstock oil to Evonik's Orange, Texas and Ivanhoe, Louisiana plants in the first and third quarters of 2010.  There is no dispute that, if there is a binding arbitration agreement, it covers the claims that Evonik has made.

In analyzing this issue, the Court first reviews, and resolves, disputes between the parties regarding how the Federal Arbitration Act ("FAA" or the "Act"), 9 U.S.C. § 1 *et seq.*, applies to this dispute.  The Court then analyzes whether the parties entered into a binding agreement to arbitrate; and whether that agreement is enforceable under chapter 2 of the FAA.  The Court finally addresses Evonik's separate claim that the Court lacks personal jurisdiction over it.

---

[7]  On September 15, 2010, Glencore's Conkling sent an email to Evonik's Chris Erickson, stating that Glencore "would like to continue our relationship as the CBFS supplier for your Ivanhoe plant for the 4th quarter of 2010" at a stated price.  The record supplied by the parties does not indicate that Evonik responded to this email.

### A.   Relevant Legal Principles Under the Federal Arbitration Act

The FAA creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes.  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). The FAA was enacted to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements 'upon the same footing as other contracts.'" *Scherk v. Alberto Culver Co.*, 417 U.S. 506, 510–11 (1974) (citation omitted).

The Act accordingly provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 3.  The Act is based on Congress's powers to regulate interstate commerce and admiralty.  It applies to "any maritime transaction or a contract evidencing a transaction involving commerce."  9 U.S.C. § 2; *Southland Corp. v. Keating,* 465 U.S. 1, 10 (1984); *Prima Paint Corp. v. Flood & Conklin Mfg. Corp.*, 388 U.S. 395, 405 (1967).

Under the FAA, it is axiomatic that arbitration is a matter of contract.  Thus, with an important limitation discussed *infra* (*see* Section II.A.2) relating to claims that arise under chapter 2 of the FAA, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts . . . should apply ordinary state-law principles that govern the formation of contracts."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Granite Rock of Chicago v. Int'l Brotherhood of Teamsters,* 130 S. Ct. 2847, 2856–57 (2010); *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011).

### 1.   The statutory presumption of arbitrability

The parties disagree whether the FAA's oft-cited "presumption of arbitrability" applies to this dispute.  The Court agrees with Evonik that it does not.

The presumption of arbitrability under the Act supplies a background principle of interpretation once it has been established that the parties have entered into an agreement to arbitrate.  In that context, the issue presented is one of scope – whether an agreement to arbitrate applies to the dispute at hand – and the presumption favoring arbitrability serves as a thumb on the scale favoring arbitral coverage.  *See Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 653 (2d Cir. 2004) (where arbitration clause exists, presumption means that "[d]oubts should be resolved in favor of coverage") (citation omitted); *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 475–76 (1989) (presumption of arbitrability requires that, "in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act, due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration") (citation omitted).

However, the FAA's presumption of arbitrability does not apply where (as here) the issue is the threshold one of whether the parties entered into a binding agreement to arbitrate at all. *See Applied Energetics*, 645 F.3d at 526 ("while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made"); *Abram Landau Real Estate v. Bevona*, 123 F.3d 69, 72 (2d Cir. 1997).  That is because, as the Supreme Court has explained, under the Act, "arbitration is strictly a matter of consent," *Granite Rock*, 130 S. Ct. at 2857 n.6, and courts may not "use policy considerations as a substitute for party agreement."  *Id.* at 2859.

Accordingly, the statutory presumption favoring arbitration applies "*only* where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed." *Id.* (emphasis added).

### 2.   Applicability of the New York Convention

Another threshold issue is whether the Act's provisions relating to non-domestic arbitral agreements apply to this dispute.  Chapter 2 of the FAA, 9 U.S.C. §§ 201–208, governs such agreements.  It codifies the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 38 (Dec. 29, 1970), *reprinted at* 9 U.S.C. § 201 ("New York Convention" or "Convention").[8]  *See Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 93 (2d Cir. 1999).  The goals of the Convention (and thus FAA chapter 2), were "to unify the standards by which agreements to arbitrate are observed" internationally, "to promote the enforcement of arbitral agreements in contracts involving international commerce so as to facilitate international business transactions," *id.* at 92 (internal quotation omitted), and "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto Culver Co.*, 417 U.S. 506, 520 n.15 (1974).

Section 202 of the FAA delineates which disputes are covered by chapter 2:

An agreement or award arising out of such a [commercial or maritime] relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property

---

[8] *See* 9 U.S.C. § 201 (providing for enforcement of the Convention); *id.* § 203 (providing that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.").

located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

9 U.S.C. § 202.  Applying § 202, the Second Circuit has held that where an agreement or award "involv[es] parties domiciled or having their principal place of business outside [the U.S.]," that agreement or award falls within the Convention.  *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997) (internal citation omitted).  The Second Circuit has also concurred with a sister circuit "that 'any commercial arbitral agreement, unless it is between two United States citizens, involves property located in the United States, and has no reasonable relationship with one or more foreign states, falls under the Convention.'"  *Id.* (quoting *Jain v. de Méré,* 51 F.3d 686, 689 (7th Cir. 1995), *cert. denied*, 516 U.S. 914 (1995)). *See also Smith/Enron*, 198 F.3d at 93 (for Convention to apply, arbitration agreement "cannot be entirely domestic in scope"); *Sphere Drake Ins. Ltd v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 29 (2d Cir. 2001) (Convention applied where parties to agreement resided in two different countries – the United States and the United Kingdom); *cf. Industrial Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH*, 141 F.3d 1434, 1441 (11th Cir. 1998).

Applying § 202 (as it has been interpreted) here, the Court agrees with Evonik that this dispute clearly arises under Chapter 2 of the FAA, and the New York Convention which chapter 2 implements.  That is because, as the parties have stipulated, Glencore is a Swiss corporation with a principal place of business located in Switzerland.[9]

Significant here, the New York Convention supplies a potentially important limitation on the FAA's ordinary standard that state-law principles determine whether an arbitral contract has been formed.  Under Article II, § 1 of the Convention:

---

[9]  Although Glencore's brief appears to acknowledge that the non-domestic chapter of the FAA applies, it does not say so explicitly, and its brief relies on decisions applying both chapters.

> Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration."

New York Convention, 21 U.S.T. 2517, 330 U.N.T.S. 38, art. II, § 1; *see U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 146 (2d Cir. 2001).  Article II, § 2 of the Convention, in turn, defines "an agreement in writing" as "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters and telegrams."  *Smith/Enron*, 198 F.3d at 93; *see generally Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 216–18 (2d Cir. 1999), *partially abrogated on other grounds by Sarhank Group v. Oracle Corp.,* 404 F.3d 657, 660 n.2 (2d Cir. 2005) (construing the "agreement in writing" requirement).

The domestic and non-domestic provisions of the FAA thus differ as to the showing that must be made by a party asserting the existence of an arbitration agreement.  In both instances, the party must show a binding agreement under "ordinary state-law principles that govern the formation of contracts."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  However, in a non-domestic case, to accord with the standards set by the New York Convention, the prevailing theory of contract formation must also entail an agreement or an arbitral clause that is either "signed by the parties" or "contained in an exchange of letters or telegrams."  *Kahn Lucas Lancaster*, 186 F.3d at 218; *cf. Yusuf Ahmed Alghanim*, 126 F.3d at 21 (domestic FAA and Convention have "overlapping coverage" only "to the extent that they do not conflict") (citation omitted); *Termorio S.A., E.S.P. v. Electranta, S.P.*, 487 F.3d 928, 940 (D.C. Cir. 2007).

Here, Evonik argues that (1) applying state-law principles relating to contract formation under the U.C.C. to the facts, no agreement between the parties to arbitrate can be found; and (2)

even if it could, the separate requirement of chapter 2 of the FAA of a signed agreement or an arbitral clause "contained in an exchange of letters and telegrams" is not satisfied.  The Court will sequentially analyze these assertions.

### 3.  Availability of summary judgment

A final background principle relevant here is that the issue of contract formation under the FAA may often be resolved at the threshold of the case, by the Court.

Section 4 of the FAA provides that "if the making of the arbitration . . . be at issue, the [district] court shall proceed summarily to the trial thereof."  9 U.S.C. § 4 (providing for right to jury trial in such circumstances).  However, for the existence of an arbitral agreement to be "at issue" so as to necessitate a trial, there must be a genuine issue of disputed fact that is material to that issue; it is not enough for the parties to assert different legal conclusions based on common facts.  *See, e.g.*, *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995) (district court acted properly in granting motion to compel arbitration on submitted papers, without trial).  As the Second Circuit has explained, "[i]n the context of motions to compel arbitration brought under the [FAA], the court applies a standard similar to that applicable for a motion for summary judgment."  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see also Sphere Drake Ins. Ltd.*, 263 F.3d at 30; *U.S. Titan, Inc.*, 241 F.3d at 145–46 (approving district court's finding of an arbitration agreement, without evidentiary hearing, where parties made extensive evidentiary submissions; the fact that parties differed "over the meaning" of the decisive telex and facsimile communications did not require trial).

Here, as in the above cases, the parties rely entirely on documentary evidence consisting of their written agreements and communications.  All of this evidence has been presented to the Court, per its order.  The issue whether these communications together establish an agreement to

arbitrate within the meaning of Chapter 2 of the FAA thus appears to be, as in the above cases, an issue suitable for judicial resolution at the threshold.

To be sure, as in these other cases, the parties here vigorously dispute "the meaning of the[se] communications." *U.S. Titan, Inc.*, 241 F.3d at 145. However, neither party has identified any material factual dispute bearing on the central issue of whether the parties entered into a contract that included a mandatory arbitral provision. Notably, neither party has proffered any oral communication whatsoever as having occurred between the parties, let alone any oral communication that either party views as potentially relevant. Nor do the parties dispute the authenticity (as opposed to the legal consequences) of any of the written communications that they have furnished to the Court.[10] And any subjective views of the parties as to the existence of a binding contract are irrelevant, as it is long-settled that a "contract has . . . nothing to do with personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent." *Hotchkiss v. Nat'l City Bank*, 200 F. 287, 293 (S.D.N.Y. 1911) (L. Hand, J.), *aff'd*, 201 F. 664 (2d Cir. 1912), *aff'd*, 231 U.S. 50 (1913).

---

[10] There is a factual dispute between the parties whether certain purchase orders prepared by Evonik in connection with the four oil shipments at issue were received by Glencore. Glencore disputes receiving these purchase orders, stating that it has no evidence of receipt; Evonik claims that it sent these orders to Glencore, although it acknowledges that it lacks any documentary evidence of this. *See* JS ¶¶ 35, 37–38, 64; Ex. 62–64, 67; GAF ¶¶ 21–22, 28; EAF ¶¶ 26–28, 31. However, these purchase orders say nothing, explicitly or implicitly, bearing on a duty to arbitrate. The Court therefore concludes that, even if it were demonstrated that Glencore had received these purchase orders, they would not disturb the Court's conclusion that this dispute is subject to a binding arbitration agreement. Because this factual dispute as to receipt of Evonik's purchase orders is immaterial, there is no need for the Court (or a jury) to resolve it.

### B.  Was There An Agreement to Arbitrate Under State Law?

As a threshold matter, the parties disagree as to which state's law applies to the question whether there was an agreement to arbitrate.  Glencore argues for New York, based on the choice of law clause in ¶ 11 of its GTCs; Glencore also notes that it is licensed to do business in New York, that Evonik agreed to (and did) direct payment to Glencore's New York bank account for each of the 2009 oil shipments, and that a current part-owner of Evonik is based in Manhattan. Evonik argues for Texas, because the Texas offices of both Glencore and Evonik were involved in the feedstock oil transactions in question, and because the deliveries to the Orange plant were made in Texas.

As between these two options, Evonik's argument for Texas is, on balance, more persuasive.  Glencore's principal basis for applying New York law, the choice-of-law provision in ¶ 11, is part of the very same provision of the GTCs to which Evonik claims it is not bound. To rely on the choice-of-law clause would therefore amount to bootstrapping.  Once that factor is excised, the remaining factors tip in favor of Texas.

In practice, however, little, if anything, turns on this disagreement.  The parties agree that this dispute between merchants is covered by the Uniform Commercial Code, which has been adopted by both New York and Texas.  *See generally* N.Y. U.C.C. LAW §§ 1-101 to 13-105 (McKinney 2011); TEX. BUS & COM. CODE ANN. §§ 1.101 to 11.108 (West 2011).  Further, the U.C.C. provisions pertinent to this dispute are identical in the two states.[11]  And the parties have not identified any relevant issue applying those provisions as to which New York and Texas law

---

[11]  *See, e.g.*, N.Y. U.C.C Law § 2-207 (McKinney 2011) ("Between merchants such [additional] terms become part of the contract unless: (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received."); TEX BUS. & COM. CODE ANN. § 2.207 (West 2011) (same).

conflict.[12]  *See Supak & Sons Mfg. Co. v. Pervel Indus.*, 593 F.2d 135, 136 (4th Cir. 1979)

(finding "no need to determine which state's law governs, since both states have enacted § 2-207

of the Uniform Commercial Code").  The Court will accordingly look to New York law, because

there is substantially more case law applying New York law on the relevant points, while also

looking to Texas law where of assistance.  *See Int'l Bus. Machs. Corp., Inc. v. Liberty Mut. Ins.

Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("Choice of law does not matter . . . unless the laws of the

competing jurisdictions are actually in conflict"; absent such a conflict, the New York court "will

dispense with choice of law analysis; and if New York law is among the relevant choices, New

York courts are free to apply it.")

### 1.  First quarter fuel shipments

The Court first analyzes whether an agreement to arbitrate was formed with respect to the

first quarter fuel oil shipments.  As to those shipments, the parties have stipulated that, in

December 2009, they "entered into a binding contract for the sale and purchase of fuel oil to be

delivered to Evonik's facilities in Orange, Texas, and Ivanhoe, Louisiana." JS ¶ 14.  The Court

agrees that, as of December 15, 2009, the parties had clearly reached agreement as to the central

terms of the transaction:  Evonik had supplied Glencore with its required specifications and

solicited a price quote; Glencore had supplied that quote; and on December 15, Evonik's Saucier

emailed Glencore, stating that Evonik was "pleased to award you supply deal for the 1st q" and

asking Glencore to "[]please have contract prepared accordingly."  Ex. 3.

---

[12]  Nor do the parties argue that the substantive law of any other state with connections to this
controversy is any different.  These include Connecticut (site of a Glencore office involved in
these transactions), Delaware (where Evonik is a limited partnership), New Jersey (site of
Evonik's principal place of business), and Louisiana (destination of the oil shipments to the
Ivanhoe plant).

The parties, however, disagree as to the legal impact of their subsequent communications. Glencore makes two arguments.  First, it argues, Evonik, through its written communications with Glencore, affirmatively manifested its agreement to be bound by the terms of Glencore's December 22 sales contract, which in turn incorporated Glencore's GTCs by reference.  Second, Glencore argues, even if this were not so, the additional terms set out in the December sales contract would become part of the parties' agreement under U.C.C. § 2-207(2), under which proposed additional terms become part of a contract between merchants unless one of three statutory exceptions is satisfied, none of which, Glencore contends, applies here.  Evonik disputes both points.  It argues that it never agreed to Glencore's GTCs, which it received on only one occasion, on January 21, 2010, and which it never substantively discussed with Glencore.  As to U.C.C. § 2-207(2), Evonik argues that the mandatory arbitration provision would "materially alter" the parties' agreement and thus falls within a statutory exception in § 2-207(2).

In the Court's view, as to the first quarter shipments, Glencore has the better of the argument as to both alternative theories of contract formation:  Evonik manifested affirmative consent to be bound by Glencore's written contract (and hence the GTCs it incorporated by reference) with respect to the first quarter shipments; and even if that were not the case, the arbitration term within the GTCs became part of the parties' agreement pursuant to U.C.C. § 2-207(2).

As to the first theory, under the U.C.C., "[a] contract for a sale of goods may be made in *any manner* sufficient to show agreement, including conduct by both parties which recognize the existence of such a contract."  N.Y. U.C.C. LAW § 2-204(1) (emphasis added); TEX. BUS. & COM. CODE ANN. § 2.204(a) (same); *see also* N.Y. U.C.C. LAW § 1-201(3) (defining "agreement" as

23

"bargain of the parties in fact as found by their language or implication from other circumstances"); *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 507 (2d Cir. 2009) ("'[t]he manifestation or expression of assent necessary to form a contract may be by word, act, or *conduct* which evinces the intention of the parties to contract.'") (quoting *Maffea v. Ippolito*, 668 N.Y.S.2d 653, 654 (2d Dep't 1998)); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 97 (2d Cir. 2007) ("'In determining whether the parties' conduct is consistent with the existence of a binding contract, it is necessary that the totality of all acts of the parties, their relationship and their objectives be considered.'") (quoting *H/R Stone, Inc. v. Phoenix Bus. Sys., Inc.*, 660 F. Supp. 351, 356 (S.D.N.Y. 1987)); RESTATEMENT (SECOND) OF CONTRACTS § 19(2) (1981) (conduct indicates assent when a party "intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents"). There is no requirement that such an agreement (including an agreement to arbitrate) be signed. *Genesco, Inc. v. T. Takiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir. 1987).

Here, after receiving Glencore's December 22 sales contract, Evonik took three distinct steps which together objectively manifested its assent to the written sales contract it had solicited from Glencore as embodying the parties' agreement with respect to the first quarter shipments.

*First*, on January 5, 2010, Saucier wrote to Glencore, asking that the sales contract be modified to reflect Evonik's correct name. Saucier did not ask Glencore to make any other change to the contract. Nor did Saucier do so after Glencore, later that day, sent back an amended contract, changed per Saucier's request. Evonik's review and revision of one aspect of the sales contract that it had solicited logically gives rise to an inference that it was at peace with, and assenting to, the balance of that contract. *See, e.g.*, *Ernest J. Michel & Co. v. Anabasis Trade, Inc.*, 422 N.Y.S.2d 79, 80 (1st Dept. 1979) (indicia of implied assent to arbitration clause

included fact that "the buyer failed to object to the arbitration provision in the only response it did make to the seller"), *aff'd*, 50 N.Y.2d 951 (N.Y. 1980).  This inference is reinforced by ¶ 11 of the sales contract, which provides that Glencore's GTCs "shall govern the terms of this transaction" absent objection from Evonik.

*Second*, on January 12, 2010, Evonik Industries AG, Evonik's parent company, sent an email to Glencore containing Evonik's parent company guarantee, or PCG.  In multiple respects, the PCG manifests Evonik's assent to be bound by Glencore's sales contract.  To begin with, the PCG itself was mandated by Glencore's December 22 sales contract.  *See* Ex. 8 ¶ 6.  Before that date, the parties had not referred to a PCG.  Evonik's compliance with the PCG term – itself supplied by the sales contract – logically communicated that it was proceeding under Glencore's contract.[13]

Additionally, the PCG repeatedly identifies Glencore's December 22 sales contract as the parties' agreement.  Thus, the PCG expressly identifies as the governing agreement "your Sales Contract No. 2103063/62/61/60/59/58" – the contract number that appears on the December 22 sales contract.  The PCG also identifies the sales contract as "the AGREEMENT" which Evonik AG was committing to guarantee.  Had Evonik intended to convey that it was not bound by the sales contract, it would instead have referred generically to an agreement between the parties with respect to No. 6 fuel oil.

Further, the PCG explains why Evonik AG is guaranteeing prompt payment under Glencore's written sales agreement.  It states that it is doing so under the AGREEMENT "in

---

[13]  On January 11, 2010, Glencore emailed Saucier, then en route to Germany, inquiring as to "the status of the pending PCG," noting that "th[e] PCG needs to be in place before 1/13/10."  Ex. 6.  Saucier wrote back on January 12, 2010 saying, "Got some more revisions to be made … My boys beat this one up pretty bad over here."  Ex. 7.

consideration of CREDITOR [Glencore] entering and continuing to enter into various agreements with Degussa Engineered Carbons LP (hereinafter referred to as the "PURCHASER"), in relation to purchases of #6 Fuel Oil concluded between the PURCHASER and the CREDITOR and delivered by the CREDITOR in the period from January 1, 2010 until March 31, 2010."

Finally, the PCG repeatedly indicates that the terms of Glencore's sales contract bound Glencore and Evonik. Thus, the PCG states that (1) Evonik AG reserved for itself all of the defenses that "PURCHASER may have under the AGREEMENT to payment of any obligation"; and (2) "CREDITOR and PURCHASER may mutually modify the AGREEMENT" without impairing or affecting the parent company's obligation under the guaranty.

Taken together, these provisions in the PCG manifest Evonik's agreement that Glencore's December 22 sales contract (as amended per Evonik's request) governed the first quarter feedstock-oil shipments.

The *third* distinct step taken by Evonik followed receipt of the amended contract. On January 21, 2010, Glencore sent Saucier an email attaching an amended sales contract, which modified descriptive language within the price section. Ex. 9. Saucier received that email and responded to it; he asked for a copy of Glencore's terms and conditions. Ex. 10; JS ¶¶ 29–30. However, neither at that time nor at any time following did he (or anyone else at Evonik) object to any aspect of the amended sales contract. *Compare Ernest J. Michel & Co.*, 422 N.Y.S.2d 79.

To be sure, as Evonik emphasizes, it had not received Glencore's GTCs during the above communications. The GTCs were emailed to Saucier several minutes after he asked for them on January 21, 2010. Ex. 10; JS ¶ 31. But, under settled contract law, that does not change the result. The sales contract unambiguously provided that, absent objection from Evonik, it

incorporated Glencore's GTCs.  And it is well-settled under the U.C.C. that where a contract expressly incorporates a second document by reference, the second document becomes part of the contract.[14]  It is also well-settled that, in dealings between merchants, it is not required that an incorporated document be furnished to the counterparty for the incorporation to be effective.

---

[14]  *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 395 (2d Cir. 2011) (finding that incorporation by reference of an AAA rule governing questions of arbitrability "serve[d] as clear and unmistakable evidence of the parties' intent" to incorporate the provision into the underlying contract) (citing *Contec Corp. v. Remote Solution Co.,* 398 F.3d 205, 208 (2d Cir. 2005)); *Merrill Lynch Inv. Mgrs. v. Optibase Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (recognizing incorporation by reference as one of the "limited theories" upon which the Second Circuit will enforce arbitration agreements even against a non signatory) (citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 780 (2d Cir. 1995)); *New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 30 (2d Cir. 1997) ("We recognize that maritime contracts may validly incorporate by reference terms from other documents or agreements.") (citing *Son Shipping Co. v. De Fosse & Tanghe,* 199 F.2d 687, 688 (2d Cir. 1952)); *Ronan Assocs. v. Local 94-94A-94B, Int'l Union of Operating Eng'rs*, 24 F.3d 447, 449 (2d Cir. 1994) (finding employment contract incorporated by reference a collective bargaining agreement including right to compel arbitration); *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 47 (2d Cir. 1993) (finding insurance contract incorporated by reference a document that included arbitration provision binding the parties to arbitrate); *see also One Beacon Ins. Co. v. Crowley Marine Serv. Inc.*, 648 F.3d 258, 267 (5th Cir. 2011) ("Under general contract principles, where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together."); *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 & n.7 (3d Cir. 2003) (enforcing arbitration clause in incorporated document; court notes that "[t]he seller's terms may include documents or provisions incorporated by reference into the main agreement"; that incorporation is proper where "the underlying contract makes clear reference to a separate document" and "the identity of the separate document may be ascertained"; and that non-receipt of the incorporated document is no defense to enforceability of its terms in dispute between seasoned merchants); 22 N.Y. JUR. 2D *Contracts* § 258 (2011) ("In the absence of anything to indicate the contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eyes of the law, one instrument.").

The burden is, instead, on the counterparty to request that document, as Evonik, eventually, did here.[15]

In any event, after requesting and then receiving Glencore's GTCs, Evonik did not object to them.  Instead, Evonik performed its obligations, and solicited new contracts from Glencore in the ensuing quarters.  And, as of the date it requested the GTCs, Evonik clearly knew that the sales contract put the onus on it to object to the GTCs if it did not wish to be bound by them: That obligation is set out in the very same paragraph (¶ 11) of the sales contract that referenced the GTCs.

In sum, the assembled communications between the parties, viewed objectively, overwhelmingly evinced Evonik's agreement and intention to be bound by Glencore's GTCs as to the first quarter shipments.  In the Court's view, these communications, viewed in totality, cannot intelligibly be read otherwise.

This case is thus a far cry from the paradigmatic "battle of the forms" context in which the law, per U.C.C. § 2-207(2), steps in to impute, or decline to impute, additional terms to an existing agreement.  There, after receiving the counterparty's proposed additional terms, a party

---

[15]  *See Aceros Prefabricados, S.A.* v. *Tradearbed, Inc.*, 282 F.3d 92, 97 (2d Cir. 2002)  ("That the General Conditions of Sale were not themselves included with the order confirmations does not render the arbitration provisions invalid."); *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 222 (2d Cir. 2000) ("The fact that Bayway had failed to attach a copy of the General Terms and Conditions was irrelevant because OMT could have obtained a copy if it had asked for one."), *aff'g Tosco Corp. v. Oxygenated Mktg. & Trading A.G.,* No. 98-cv-4695, 1999 WL 328342, at *3 (S.D.N.Y. May 24, 1999); *Standard Bent Glass Corp.*, 333 F.3d at 448 ("Standard Bent Glass should have advised Glassrobots it had not received [the referenced document], if that were the case. Its failure to object to the arbitration terms of [the referenced document], absent surprise or hardship, makes those terms part of the contractual agreement."); *Hagrpota for Trading & Distribution v. Oakley Fertilizer Inc.*, No. 09-cv-9779, 2010 WL 2594286, at *4 (S.D.N.Y. June 18, 2010) (where confirmations incorporated terms and conditions by reference, "the fact that the text of the terms and conditions was not transmitted is immaterial").

stands mute and does no more than perform its obligations.  Here, by contrast, Evonik – by its actions including soliciting, receiving, amending, referencing, guaranteeing, and performing under Glencore's sales agreement – affirmatively indicated assent to that agreement.

Even if this were not the case, the Court would alternatively find, under U.C.C. § 2-207(2), that the mandatory arbitration provision became part of the parties' agreement.  Under § 2-207(2), in dealings among merchants, proposed additional terms become part of the contract except where they offer expressly limited acceptance to the terms of the offer, *id*. § 2-207(2)(a), where the additional terms "materially alter" the contract, *id*. § 2-207(2)(b), or where the counterparty objects within a reasonable time after notice of the additional terms, *id*. § 2-207(2)(b).[16]  Evonik relies solely on the second exception, claiming that the arbitration clause materially altered the parties' agreement.

In *Aceros Prefabricados, S.A. v. Tradearbed, Inc.*, 282 F.3d 92 (2d Cir. 2002), the Second Circuit held that, under § 2-207(2)(b) of the New York U.C.C, a mandatory arbitration provision is neither *per se* material or immaterial.  That question is instead answered "by examining, on a case-by-case basis, their materiality under a preponderance of the evidence standard as we would examine any other agreement."  *Id.* at 100.  In that inquiry, the burden of proving materiality "must fall on the party that opposes inclusion . . . because the UCC presumes

---

[16]  Section 2-207(2) of the U.C.C. provides:

> The additional terms are to be construed as proposals for addition to the contract. Between merchants, such terms become part of the contract unless:
>
> (a)  the offer expressly limits acceptance to the terms of the offer;
> (b)  they materially alter it; or
> (c)  notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

N.Y. U.C.C. Law § 2-207(2) (McKinney 2011); Tex. Bus & Com. Code Ann. § 2.207(2) (West 2011).

that between merchants additional terms will be included in a contract." *Id.* (citations omitted). *Aceros* further instructs that a material alteration is "one that would 'result in surprise or hardship if incorporated without express awareness by the other party.'" *Id.* (quoting N.Y. U.C.C. LAW § 2-207 cmt. 4). Surprise includes "both a subjective element of what a party actually knew and an objective element of what a party should have known"; thus, a profession of surprise is insufficient to establish surprise unless the non-assenting party can also "'establish that, under the circumstances, it cannot be presumed that a reasonable merchant would have consented to the additional term.'" *Id.* (quoting *Bayway Ref. Co.*, 215 F.3d at 223).

Furthermore, "[u]nder New York law, an arbitration agreement does not result in surprise or hardship where arbitration is the custom and practice within the relevant industry." *Aceros*, 282 F.3d at 101; *see also Oceanconnect.com, Inc. v. Chemoil Corp.*, No. H-07-1053, 2008 WL 194360, *2 (S.D. Tex. 2008); *Colorado-Arkansas-Texas Distrib., LLC v. Am. Eagle Food Prods., Inc.*, 525 F. Supp. 2d 428, 434–35 (S.D.N.Y. 2007) (enforcing arbitration clause contained in sales orders where buyer did not object to the order and where such clauses were "common, if not customary" in the industry).[17]

---

[17] In *Aceros*, the Second Circuit discarded the earlier "New York rule" that provided that a party could not be held to an arbitration agreement absent an "explicit commitment" by that party agreeing to that clause. It accordingly rejected the lower court's construction of that rule to mean that an arbitration provision necessarily "materially alters [a party's] legal rights under a contract." 282 F.3d at 99. Any such rule, the Court explained, would disfavor arbitration clauses relative to other contractual provisions, and thus was preempted by the FAA, under which the "disparate treatment of arbitration provisions is not permitted." *Id.* at 100 (citing *Perry v. Thomas*, 482 U.S. 483 (1987)). Evonik speculates that the Texas Supreme Court may one day hold that arbitration clauses are *per se* material, under the U.C.C. § 2-207 as enacted in Texas. However, Evonik has not cited any authority to support that claim. On the contrary, the available authority as to Texas law is in full accord with *Aceros*. *See Oceanconnect.com, Inc. v. Chemoil Corp.*, No. H-07-1053, 2008 WL 194360, at *2–3 (S.D. Tex. 2008) (citing *Aceros* and cases following it with approval, and collecting Texas cases enforcing arbitration clauses under the Texas version of U.C.C. §2-207 "when the parties proceed under the contract, maintain a

Notwithstanding the test of materiality set out in *Aceros*, a case addressed in both parties' briefs, Evonik has noticeably failed to argue at all that inclusion of a mandatory arbitration clause provision would cause it surprise (measured subjectively or objectively) or hardship.  Nor, despite the Court's direction to the parties to identify any facts they regarded as germane to the issue of arbitrability, has Evonik proffered any facts indicative of surprise or hardship.[18]  On the contrary, the stipulated facts are inconsistent with a finding of surprise.  Evonik's Saucier, after soliciting and receiving Glencore's GTCs, not only did not object to them – he proceeded to enter into parallel agreements with Glencore, incorporating by reference the very same arbitration clause, for the second and third quarters of 2010.

This case thus presents an even weaker claim of surprise than that rejected in *Aceros*.  There, Aceros's founder and general manager at least averred (albeit in conclusory terms) that the unconsented-to arbitration clause "would result in surprise and hardship to [it]."  *Aceros*, 282

---

working relationship under the contract's terms, and do not object to the arbitration provision"). In any event, any state court rule holding an arbitration clause *per se* material would be preempted by the FAA for the very reasons set forth in *Aceros*.  The Court is therefore unwilling to speculate that the Texas Supreme Court would so hold.

[18]  Evonik has included in its factual submissions a handful of purchase orders prepared in connection with different transactions engaged in by a foreign affiliate with an affiliate of Glencore's, in 2007 and 2008.  *See* Exs. 29, 33, 36, 40, 43, 45, 48, 52, 53, 57.  Those purchase orders incorporate by reference Degussa's (*i.e.*, Evonik's) General Terms and Conditions, *see* Ex. 28 at 4, which did not provide for arbitration.  The Court agrees with Glencore that those purchase orders have no bearing on the terms of the agreement between the parties at issue in this case, nor are they sufficient to establish surprise or hardship.  *See* cases cited at n.19, *infra*. They do show, however, that it was Evonik's ordinary course of business in 2007 and 2008 to draft purchase orders that incorporated by reference GTCs, the text of which were not attached to the actual purchase order.  *See, e.g.*, Exs. 29, 33, 36, 40, 43, 45, 48, 52, 53, 57.

F.3d at 101.[19]  Here, Evonik makes no such claim.  Moreover, far from being unexpected,

arbitration clauses are often invoked in the petroleum industry.[20]

      For the above reasons, the Court holds that, under state contract law enacting the U.C.C.,

the first quarter shipments between Glencore and Evonik were subject to the binding arbitration

clause incorporated by reference into Glencore's sales agreement.

---

[19]  Claims of material alteration have been rejected in other cases, based on inadequate
demonstrations of surprise.  *See, e.g.*, *ICC Chemical Corp. v. Vitol Inc.*, 425 F. App'x 57, 59 (2d
Cir. 2011) (summary order) (affirming a finding that arbitration clause was not material where
declaration submitted by  party opposing arbitration stated that traders in his industry sometimes
agreed, and sometimes did not, to arbitration clauses; this showing did not "demonstrate the
required objective surprise"); *Standard Bent Glass*, 333 F.3d at 448 (rejecting a claim of surprise
and hardship based solely on company president's affidavit stating that he never received the
incorporated document containing arbitration clause and that "the company disfavors arbitration
clauses generally"); *Hagrpota*, 2010 WL 2594286, at *5–6 (rejecting claim of surprise where
party opposing arbitration had never objected to arbitration clause incorporated by reference); *cf.*
*Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 708 (2d Cir. 2007) (enforcing, under
New York U.C.C. § 2-207(2), a provision in seller's invoices that provided for recovery of
attorney's fees in event of non-payment, where defendants "failed to offer any evidence to
demonstrate either objective or subjective surprise").

[20]  *See, e.g.*, *ICC Chemical Corp.*, 425 F. App'x at 59–60 (finding no surprise where ICC
Chemical failed to adequately distinguish arbitration clause at issue from the other arbitration
clauses that witness acknowledged were sometimes used in petroleum and chemical industries);
*HRD Corp. v. Bagherzadeh*, No. H-10-1747, 2011 WL 1157544, at *1 (S.D. Tex. Mar. 24, 2011)
(underlying arbitration arose out of a contractual dispute dealing with development of
technologies for the petroleum industry); *Schlumberger Tech. Corp. v. Baker Hughes Inc.*, No.
01-11-00562-CV, 2011 WL 4925996 (Tex. Ct. App. Oct. 13, 2011) (finding that an arbitration
agreement existed between two manufacturers of tools for use in the oil and gas industry); *In re
Chevron USA, Inc.*, No. 08-08-00082-CV, 2010 WL 299152 (Tex. Ct. App. Jan. 27, 2010)
(finding that the FAA governed arbitration arising out of a contract between operator of oil and
gas leases and owner of non-participating royalty interests).  *Cf. Smith/Enron Cogeneration Ltd.
P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 96 n.7 (2d Cir. 1999) ("[t]he Texas
Supreme Court has several times announced its pro-arbitration policy").

### 2.   Third quarter fuel shipments

The Court turns, next, to the third quarter fuel oil shipments.  As to those shipments, Evonik manifested its assent to Glencore's contract and to the incorporated arbitration clause even more strongly than with respect to the first quarter shipments.  Two additional factors merit note.  First, in awarding Glencore the "supply deal" for the third quarter for its Ivanhoe plant, Saucier, on June 21, directed Glencore to "please send out contracts as soon as you can."  Given the parties' course of dealings to that point, that request can only logically be read to commission the very same type of Glencore sales contract that Saucier had solicited, received and commented on for the first, and second, quarters.

Second, on June 29, Glencore sent Saucier a sales contract containing the same language incorporating its GTCs.  Unlike at the comparable point in the first quarter contracting process Saucier at this point had actual possession of Glencore's incorporated GTCs – he had solicited and received them by email on January 21.  In his June 29 email response to Glencore, Saucier asked Glencore to restore the contract's "quality section" consistent with language he attached, but otherwise proposed no changes to the contract.  Evonik's singular objection as to the quality section and failure to object to any other language in the sales contract therefore carried an even stronger message of assent to Glencore's GTCs.  Notably, after Glencore sent him an agreement that did not input his change, Saucier, on July 2, again emailed to ask that the quality section be changed, while again proposing no other modifications.

Under these circumstances – where Evonik solicited a contract that it at least constructively knew incorporated an arbitration clause, twice objected to another feature of the contract while being mum about the arbitration clause, and then performed pursuant to it – Evonik clearly communicated its intention that Glencore's sales contract would govern the

parties' third quarter dealings.  Even if this were not so, the Court's earlier analysis under U.C.C.

§ 2-207(b), under which the arbitration clause became part of the parties' agreement, would

apply with equal force to the third quarter shipments.

### 3.   Alleged internal ambiguity within the GTCs as to arbitration

Several weeks after the parties' briefing on the motion to compel arbitration was

complete, Evonik wrote the Court to advance a new argument.  Evonik asserted that it had

discovered a clause within a different paragraph (¶ 4) of the GTCs, which, it argued,

irreconcilably conflicts with the requirement of mandatory arbitration set out in ¶ 11 of the

GTCs.  As a result, Evonik argued, even if the GTCs were part of the parties' agreement, they

are fatally ambiguous as to a whether there was a duty to arbitrate, and thus there was never a

true meeting of the minds on that point.  The Court invited and received briefing from the parties

on this issue.  *See* Order, Jan. 4, 2012 (Dkt. 44); Resp't's Second Mem. of Law, Jan. 9, 2012

(Dkt. 45); Pet'r's Mem. of Law, Jan. 14, 2012 (Dkt. 47).  Having reviewed these briefs and the

applicable law, the Court rejects Evonik's contention.

Paragraph 4 of the GTCs reads:

4.  LIMITATION OF LIABILITY

In no event shall either party be liable for any incidental, exemplary,
consequential, punitive, or indirect or special losses or damages of any kind
arising out of or in any way connected with the performance of or failure to
perform this Agreement, including, but not limited to, lost profits, loss of
production or losses resulting from shutdown of plants, or inability to perform
sales or any other contracts arising out of or in connection with the performance
or nonperformance of this Agreement.  Seller's liability with respect to the
Agreement or any action in connection herewith whether in agreement, tort or
otherwise shall not exceed price of the Product(s) sold under the Agreement.
Claims as to shortage in quantity, defects in quality, or any others, except for
demurrage or shifting, shall be made by written notice to the other party no later
than ninety (90) days after the delivery in question or shall be deemed to have
been waived.  Further, any legal actions taken to enforce any rights or obligations

under the Agreement must be properly filed in a competent court against Seller no later than one (1) year after the alleged breach of the Agreement occurred.

Evonik argues that the last sentence of ¶ 4, requiring that any legal actions "be properly filed in a competent court against Seller, "cannot be reconciled" with ¶ 11's requirement that "any claim or controversy arising out of, or relating to, this contract or breach thereof "shall be settled by arbitration."

The Court disagrees.  It is black-letter law, in both New York and Texas, that courts are to construe contract terms so as, where possible, to give rational meaning to all provisions in the document.[21]  In soliciting briefs from the parties as to alleged conflict between ¶ 4 and ¶ 11, the Court instructed the parties to explain how these two provisions are properly interpreted in light of this principle.  *See* Order, Jan. 4, 2012 (Dkt. 44).  Evonik disputed that the two paragraphs could be coherently harmonized.  Evonik identified only one potentially harmonizing interpretation:  It stated that one might initially conclude that a Seller (here, Glencore) "can file a demand for arbitration to enforce its rights," whereas a Buyer (here, Evonik) "would nonetheless be obligated to file an action in a competent court."  However, Evonik stated, such an

---

[21]  *See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 729 (2d Cir. 2010) (Under Texas law, the "primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract.  To discern this intent, we examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless.") (citing *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (emphasis in original) (internal quotation marks omitted); *Kelso Enters. Ltd. v. A.P. Moller-Maersk A/S*, 375 F. App'x 48, 49 (2d Cir. 2010) (summary order) ("[W]hen interpreting a contract or multiple contracts in a transaction, we strive to give effect to all of the terms of the relevant documents, reading them together."), *aff'g Kelso Enters. Ltd. v. Diadema*, No. 08-cv-8226, 2009 WL 1788110 (S.D.N.Y. June 23, 2009); *Paneccasio v. Unisource, Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008) ("The rules of contract construction require us to adopt an interpretation which gives meaning to every provision of the contract."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (2008) ("all writings that are part of the same transaction are interpreted together").

interpretation was untenable, because it would still conflict with ¶ 11's requirement that "any claim or controversy . . . shall be settled by arbitration."  *See* Resp't's Second Mem. of Law 4–5.

In fact, the two provisions are readily reconciled.  Unlike ¶ 11, ¶ 4 is not, fundamentally, about the choice of forum.  Instead, consistent with its title, ¶ 4 sets forth various limitations on liability.  It begins by setting forth substantive limitations on liability; it concludes by setting forth timing limitations – the deadline by which notice of certain types of claims must be made, and the deadline (one year) by which "legal actions taken to enforce any rights or obligations under the Agreement must be properly filed."

Evonik seizes on the end of that clause, but it is not correct that ¶ 4's requirement that a legal action "be properly filed in a competent court against Seller [within one year]" undermines ¶ 11's clear mandate of arbitration.  Paragraph 4, by its terms, refers only to the *filing* of a lawsuit (as to which it sets a one-year deadline).  It says nothing whatsoever about where the claims made in such a lawsuit are to be *resolved*.  Paragraph 11, by contrast, squarely addresses that:  It provides that "any claim or controversy . . . shall be *settled* by arbitration."  GTCs ¶ 11 (emphasis added).  And, as experienced commercial litigators are well aware, it is common that lawsuits subject to a binding arbitration clause are initially filed in a court, and only later directed to binding arbitration, after a motion to compel arbitration has been made in, and granted by, that court, including on the basis of a prior agreement between the parties.  *See, e.g.*, *Sanders v. Forex Capital Mkts. LLC*, No. 11-cv-0864, 2011 WL 5980202, at *3–4 (S.D.N.Y. Nov. 29, 2011); *Stolt Tankers BV v. Allianz Deguros S.A.*, No. 11-cv-2331, 2011 WL 2436662, at *4–5

(S.D.N.Y. June 16, 2011); *Hird v. iMergent, Inc.,* No. 10-cv-166, 2011 WL 43529, at *1 (S.D.N.Y. Jan. 6, 2011).  That, in fact, is the very posture of this case.[22]

As to the issue of forum, ¶ 4 thus at most can be read to require that a Seller who wishes to bring a legal action to enforce rights or obligations under the agreement must initiate, or file, that suit in a judicial court, as opposed to before an arbitral body.[23]  Paragraph 4 does not in any way conflict with, or undermine, the requirement of ¶ 11 that such legal actions be "settled" (*i.e.*, resolved) in arbitration.  And, on Glencore's motion to compel arbitration following Evonik's filing of this lawsuit, that is all that is at issue.  This reading gives effect to the plain language of both GTC provisions.  *See AEP Energy Servs.*, 626 F.3d at 729.

In support of its claim, Evonik relies on *ISC Holding AG v. Nobel Biocare Investments N.V.*, 351 F. App'x 480 (2d Cir. 2009) (summary order), but *ISC Holding* is, clearly, inapposite. The agreement provision at issue in that case required the parties "to have the dispute submitted to binding arbitration through The American Arbitration Association or to any other U.S. court." After the district court declined to compel arbitration, the Second Circuit vacated and remanded. It held that that provision was textually ambiguous as to whether "any other U.S. court" meant

---

[22]  A court order compelling arbitration may have the salutary benefit of eliminating any doubt (and obviating a potential post-decision challenge) as to the legitimacy of the arbitral forum.  As Glencore points out, in such cases, the court in which the legal action was originally filed may choose to stay the lawsuit pending the outcome of the arbitration.  *See* Pet'r's Mem. of Law 6–7, Jan. 14, 2012 (Dkt. 27).  That way, in the event that post-arbitration applications are necessary (whether brought by the prevailing party, to confirm or enforce the arbitrators' ruling; or by the losing party, to vacate or challenge it), the court may lift the stay to address such matters, without the need for that party to initiate a new action.

[23]  Arguably, the expression "a competent court" is broad enough to embrace either a judicial court or an arbitral forum, such that a Seller who timely filed a legal claim with the American Arbitration Association, the arbitral body identified in GTC ¶ 11, rather than in a judicial court, would conform to the filing requirements of ¶ 4.  The Court need not resolve that issue, both because it is not presented by this case, and because it does not bear on the issue that is presented here, which is whether arbitration is mandatory as the means of *resolving* a legal claim made under an agreement governed by the GTCs.

only "a U.S. arbitral court" other than AAA or whether it also encompassed a judicial court, *id.* at *2, and remanded for further proceedings.  The provision in *ISC Holding* is easily distinguished from that at issue here, because in *ISC Holdings* it was internally ambiguous as to whether the parties had agreed to resolve their disputes by arbitration only.  By contrast, the provision relied on by Evonik here (¶ 4) addresses only the forum in which one party's legal claims must be filed.  It does not undermine the different GTC provision (¶ 11, "Laws and Arbitration") that unambiguously provides for resolution of all such claims by mandatory arbitration.

Furthermore, even if the provision at issue in *ISC Holding* were apposite, that case would not dictate the outcome here.  The Second Circuit in *ISC Holding* did not hold that the textual ambiguity of the provision at issue there precluded a finding of arbitrability.  Had it done so, it would have affirmed the denial of the motion to compel arbitration.  Rather, the Second Circuit remanded for further investigation of the meaning of that provision.  "When 'the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered.'" *ISC Holding*, 351 F. App'x at 481 (quoting *JA Apparel Corp. v. Abboud,* 568 F.3d 390, 397 (2d Cir. 2009)).  However, after remand, the lawsuit in that case was ultimately dismissed with prejudice, perhaps based on a settlement by the parties, and the record of the case does not disclose any subsequent ruling on the provision at issue.  *See ISC Holding AG v. Nobel Biocare Invs. N.V.*, No. 08-cv-11051 (S.D.N.Y. Jan. 18, 2011) (Dkt. 66).

In rejecting Evonik's argument based on ¶ 4, the Court has not relied on a presumption favoring arbitrability.  Rather, the Court has applied basic principles of contract interpretation. However, the Court notes that – with it having been found that Glencore's GTCs were part of the parties' agreement – that presumption supplies an additional basis to enforce the requirement in

¶ 11 of mandatory arbitration.  Paragraph 11 is, by its terms, a broad agreement to arbitrate.  And "the existence of a broad agreement to arbitrate . . . is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the dispute."  *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 284 (2d Cir. 2005) (quoting *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 72 (2d Cir.1997)) (internal quotation marks omitted).  Paragraph 11 of the GTCs is clearly susceptible of such an interpretation.

In this respect, the Second Circuit's decision in *Kelso Enterprises* is instructive.  There, the Second Circuit affirmed a lower court ruling that a broad arbitration provision had not been overridden by a provision in the bill of lading which included a forum selection clause.  *See Kelso Enters. Ltd. v. A.P. Moller-Maersk A/S*, 375 F. App'x 48, 50 (2d Cir. 2010) (summary order), *aff'g Kelso Enters. Ltd. v. Diadema*, No. 08-cv-8226, 2009 WL 1788110, at *1 n.11 (S.D.N.Y. June 23, 2009).  Under such circumstances, the Court held, the forum selection clause "cannot nullify an arbitration clause unless the forum selection clause specifically precludes arbitration."  *Bank Julius Baer*, 424 F.3d at 284 (internal citation omitted).  The forum selection clause at issue in *Kelso Enterprises* did not do so.  The same is true here, in that GTC ¶ 4 clearly does not "specifically preclude arbitration."

The Court therefore rejects Evonik's belated argument that, as to the requirement of binding arbitration, the GTCs are internally contradictory and incapable of being reconciled.[24]

---

[24]  Although the issue of contract formation is to be (and has been here) decided solely on the basis of the parties' objective manifestations, it is revealing that it took Evonik more than three months after Glencore demanded arbitration, and several weeks after briefing was complete before this Court, to discover the argument that Glencore's GTCs were, ostensibly, inherently ambiguous as to whether arbitration was mandatory.  *See* Resp't's Second Mem. of Law 7.  Had there been genuine fatal ambiguity on this point, it presumably would have been apparent to Evonik's seasoned counsel as soon as they engaged substantively on Glencore's motion to compel and reviewed the GTCs.

**C.  Does The Parties' Agreement to Arbitrate Satisfy the New York Convention?**

In its most substantial challenge to the motion to compel arbitration, Evonik argues that there was no "agreement in writing" between the parties within the meaning of the New York Convention, *i.e.*, a signed agreement, or an agreement or arbitral clause "contained in an exchange of letters and telegrams."  Evonik devotes the bulk of its opening and reply briefs to this argument, and it is correct that the standard for satisfying the Convention's "agreement in writing" requirement is more stringent than the standard for contract formation under the U.C.C. However, after giving the matter considerable attention, the Court concludes that the parties' written communications comfortably satisfy the standard set by the Convention.

Evonik relies largely on *Kahn Lucas Lancaster*, in which the Second Circuit overturned an order granting a motion to compel arbitration on the grounds that there had been no "agreement in writing" under the Convention.  *See Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210 (2d Cir. 1999), *partially abrogated on other grounds by Sarhank Grp. v. Oracle Corp.,* 404 F.3d 657, 660 n.2 (2d Cir. 2005).  In *Kahn Lucas Lancaster*, Lark (a Hong Kong-based purchasing agent for businesses seeking to buy clothing manufactured in Asia) assisted Kahn Lucas Lancaster (a New York-based reseller of imported clothing) in arranging for overseas manufacturers to make garments ordered by Kahn Lucas Lancaster.  After a dispute about defective garments and deliveries arose, Kahn Lucas Lancaster moved to compel arbitration.  The arbitration clause it invoked appeared on the reverse side of purchase orders which it had prepared and which Lark processed in the course of assisting Kahn Lucas Lancaster. 186 F.3d at 213.  On these facts, the Second Circuit held that there was no "agreement in writing."  There was no "signed agreement," because the purchase orders had not been signed by Lark.  And the purchase orders, even viewed along with "confirmation of order" forms that Lark

had sent to Kahn Lucas Lancaster, did not satisfy the requirement of an arbitral clause "contained in an exchange of letters or telegrams." *Id.* at 217.[25]

The situation presented in *Kahn Lucas Lancaster* is essentially the paradigmatic one to which U.C.C. § 2-207(b) is addressed:  After completion of an agreement, one party unilaterally seeks to impose additional terms by including them in a purchase order, invoice or other written communication to which the counterparty never responds.  As the case law recognizes, in that situation, no "exchange of letters or telegrams" has occurred so as to render the agreement enforceable under the Convention, regardless of whether a mandatory arbitration term would be deemed part of the parties' agreement under U.C.C. § 2-207(2).  *See, e.g.*, *AGP Indus. SA v. JPS Elastromerics Corp.*, 511 F. Supp. 2d 212, 215 (D. Mass. 2007) (no "agreement in writing" under Convention where buyer's purchase orders said nothing about arbitration and reverse side of seller's invoice contained arbitration clause to which buyer did not respond; court holds that "the phrase 'exchange of letters or telegrams' suggests a level of interchange that is not present during a mere exchange of forms"); *Bothell v. Hitachi Zosen Corp.*, 97 F. Supp. 2d 1048, 1053 (W.D. Wash. 2000) (no "agreement in writing" under Convention where, following oral agreement and letter confirmation, neither of which referred to arbitration, buyers sent purchase orders to seller that attached "General Terms and Conditions" that included a mandatory arbitration provision, to which seller never responded).

For multiple reasons, this case presents a completely different situation.[26]  First, unlike in *Kahn Lucas Lancaster*, *AGP Industries*, or *Bothell*, the arbitration clause here was not included

---

[25] Kahn Lucas had not even argued that there was an arbitral clause "contained in an exchange of letters and telegrams."  Its argument for arbitrability instead rested on a construction of the term "agreement in writing" which the Second Circuit rejected.  *Id.* at 216–18.

in a form unilaterally supplied by one party following the parties' agreement.  Rather, with respect to both the first and third quarter shipments, the arbitral clause was contained in a written agreement, Glencore's sales contract, which was affirmatively solicited by Evonik, and which unambiguously incorporated by reference the mandatory arbitration term.  Second, and pivotally, the counterparty here was not mute in response to receiving a form containing the arbitral clause.  Rather, with respect to both quarters, Evonik replied to Glencore, proposing changes in the sales contract, but not with regard to the arbitration clause (or Glencore's other GTCs).  In all three quarters, in fact, there were back-and-forth email exchanges between the parties regarding other features of the sales contract, giving rise to a negative implication that Evonik accepted its other terms.[27]  Third, as related extensively above, Evonik manifested in various ways its assent to be bound by the contract containing the arbitration clause.  This was apparent, for example, in the PCG, which expressly guaranteed Glencore's sales contract in its entirety.  And, fourth, unlike in *Kahn Lucas*, *AGP Industries*, and *Bothell*, the parties specifically communicated about the GTCs containing the arbitration clause.  In January 2010, Saucier asked Glencore to send him the GTCs; and after Glencore did so, Evonik, far from objecting, performed, and even asked Glencore to send new contracts for the ensuing two quarters.

---

[26]  Evonik relies on two other cases in addition to *Kahn Lucas Lancaster*, *AGP Industries*, and *Bothell*, but both also address situations far afield from this one.  The arbitral clause at issue in *Czarina, L.L.C. v. Halvanon Ins. Co.*, 254 F. Supp. 2d 1229, 1237 (M.D. Fla. 2002) was contained in "sample wording" which was never shown to have been signed or otherwise adopted.  And in *Sen Mar, Inc. v. Tiger Petroleum Corp.*, 774 F. Supp. 879, 882–83 (S.D.N.Y. 1991), the counterparty, Tiger, affirmatively *disavowed* the entire contents of the post-agreement telexes sent to it by Sen Mar, one of which contained the arbitration clause at issue.

[27]  The parties do not dispute that email communications qualify as "letters and telegrams" within the meaning of the Convention.

This case thus involves an entirely different level of interchange between the parties than present in *Kahn Lucas Lancaster*, and compelling evidence of a meeting of the minds between the parties on the terms set forth in the contract incorporating the arbitration clause. The Court concludes, comfortably, that the parties' written back-and-forth in each quarter – including serial revisions of Glencore's sales contract and adoption of it by Evonik – satisfies the requirement of an arbitral clause "contained in an exchange of letters and telegrams" within the meaning of the Convention.[28]

**D. Is There Personal Jurisdiction Over Evonik?**

Evonik, finally, argues that the Court lacks personal jurisdiction over it. However, that claim can succeed only if the Court were to find that Evonik was not bound by Glencore's GTCs. Paragraph 11 of the GTCs provides that "[t]his contract shall be governed by and construed in

---

[28] *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 392–93 (2d Cir. 2011) (finding that when one party is a sovereign signatory to a bilateral investment treaty with a provision for arbitration, the treaty "constitutes a standing offer to arbitrate disputes covered by the [t]reaty," and "a foreign investor's written demand for arbitration completes the 'agreement in writing' to submit the dispute to arbitration."); *Bautista v. Star Cruises*, 396 F.3d 1289, 1301 (11th Cir. 2005) (written agreement requirement satisfied by contract; rejecting the argument that the party "seeking arbitration [has] the burden of demonstrating notice or knowledgeable consent"); *Standard Bent Glass Corp.*, 333 F.3d at 449–50 (Convention requirements satisfied by parties' exchange of correspondence attaching sales agreement containing arbitration clause; "although the arbitration clause may not have been included in that exchange, it was incorporated by reference in the letters. This is all [the Convention] requires."); *Dumitru v. Princess Cruise Lines, Ltd.*, 732 F. Supp. 2d 328, 335 (S.D.N.Y. 2010) (written agreement requirement satisfied by a signed agreement providing that disputes would be resolved by arbitration "as provided by the Terms and Conditions," and acknowledging that he reviewed the Terms and Conditions); *Allen v. Royal Caribbean Cruise, Ltd.*, No. 08-22014-Civ., 2008 WL 5095412, at *5 (S.D. Fla. 2008) (written agreement requirement satisfied when arbitration agreement was contained in a separate document incorporated by reference into the main contract); *cf. Czarina, L.L.C. v. Halvanon Ins. Co.*, 254 F. Supp. 2d 1229, 1237 n.17 (M.D. Fla. 2002) ("The alternative opportunity to show an 'agreement in writing' created by an 'exchange of letters or telegrams' erects an only minimal burden.") (citation omitted).

accordance with the laws of the State of New York, USA, and any claim or controversy arising out of, or relating to this contract or breach thereof shall be settled by arbitration . . . in the City of New York . . . ."  It is black-letter law in New York that such a provision in an arbitration clause, if agreed to by the parties, gives courts in New York jurisdiction to enforce the arbitration clause.  *See* N.Y. C.P.L.R. § 7501 (a "written agreement to submit any controversy . . . to arbitration is enforceable . . . and confers jurisdiction on the courts of the state [of New York] to enforce it and to enter judgment on an award."); *see e.g.*, *Nat'l City Golf Finance v. Higher Ground Country Club Mgmt. Co.*, 641 F. Supp. 2d 196, 203 (S.D.N.Y. 2009) ("Courts have consistently interpreted this rule [C.P.L.R. § 7501] to require that an agreement to arbitrate be in writing but not necessarily be signed by the party to be bound."); *Franklin Hamilton LLC v. Creative Ins. Underwriters, Inc.*, No. 08-cv-7449, 2008 WL 4837680, at *1 (S.D.N.Y. Nov. 6, 2008) (citing C.P.L.R. § 7501).  At oral argument, Evonik conceded this point.  *See* Conf. Tr., Nov. 2, 2011, 29:1–30:21 (Dkt. 27).

Here, the Court has found that Evonik was contractually bound, as to both the first and third quarters, by Glencore's sales contract for that quarter, including the GTCs which that sales contract incorporated by reference.  Accordingly, this Court properly exerts jurisdiction over Evonik.[29]

---

[29] In light of this finding, the Court does not reach Glencore's alternative argument as to personal jurisdiction, under New York's long-arm statute, based on Evonik's transaction of business in the state.  *See* N.Y. C.P.L.R. LAW § 302(a)(1); *Barron Partners, LP v. Lab123, Inc.*, No 07-cv-11135, 2008 WL 2902187, at *11 (S.D.N.Y. July 25, 2008).

## CONCLUSION

For the reasons discussed above, Respondent's motion to dismiss is DENIED, and Glencore's petition to compel arbitration is GRANTED. The parties shall inform the Court by written submission no later than February 3, 2012, whether there are any applications to be made or any additional issues that require the Court's review. If no additional issues remain, the Court will direct that this case be closed.

SO ORDERED.

*Paul A. Engelmayer*

_____
Paul A. Engelmayer
United States District Judge

Dated: January 24, 2012
       New York, New York